**GLANCY PRONGAY & MURRAY LLP**
LIONEL Z. GLANCY (#134180)
ROBERT V. PRONGAY (#270796)
LESLEY F. PORTNOY (#304851)
CHARLES H. LINEHAN (#307439)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:  rprongay@glancylaw.com

*Attorneys for Plaintiff*
[Additional Counsel on Signature Page]

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHENG JIANGCHEN, Individually and on Behalf of All Others Similarly Situated, | Case No.: |
| | <u>CLASS ACTION</u> |
| Plaintiff, | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| vs. | |
| RENTECH, INC., and KEITH B. FORMAN, | |
| Defendants. | <u>**DEMAND FOR A JURY TRIAL**</u> |

Plaintiff Cheng Jiangchen, individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by Rentech, Inc. ("Rentech" or the "Company"), as well as media and analyst reports about the Company and conference all transcripts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of common stock of Rentech between November 10, 2016 and February 20, 2017, inclusive (the "Class Period"), alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is confirmed by §27 of the Exchange Act, 15 U.S.C. §78aa.

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). The acts and transactions giving rise to the violations of law complained of occurred and Rentech's headquarters are located in this District.

5.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

6.     Plaintiff Cheng Jiangchen purchased Rentech common stock during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages.

7.     Defendant Rentech is a California corporation with its principal executive offices located in Los Angeles, California. Rentech is a renewable energy company that specializes in the processing and manufacturing of wood fibre and nitrogen fertilizer.

8.     Defendant Keith B. Forman ("Forman") is, and was at all relevant times, the President and Chief Executive Officer ("CEO") of Rentech and a member of its Board of Directors.

9.     During the Class Period, Defendant Forman served as Rentech's CEO and oversaw the Company's operations and finances. Defendant Forman was

intimately knowledgeable about all aspects of Rentech's financial and business operations. He was also intimately involved in deciding which disclosures would be made by Rentech. Defendant Forman made various public statements for Rentech during the Class Period, and participated in Class Period investor conferences.

## BACKGROUND TO THE CLASS PERIOD

10.   Rentech is a production and manufacturing company that focuses on renewable energy technologies. The Company specializes in the production and utilization of wood fibre into various high value products, such as wood pellets and wood chips. The Company also manufactures nitrogen fertilizers.

11.   On November 3, 2016, Rentech issued a press release announcing Paul Summers as the new Chief Financial Officer of the Company, effective on November 11, 2016. This followed the resignation of former CFO Jeffrey R. Spain, who had held that position for less than a year.

## DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

12.   The Class Period starts on November 10, 2016.  On November 10, 2016, Rentech issued an earnings release announcing its third quarter 2016 financial results.  In the press release, Defendant Forman emphasized the completed repairs of equipment at two of the Company's operating facilities, Wawa and Atikokan, and the significant amount of production that could be expected at the Wawa facility stating, in pertinent part, as follows:

Commenting on the quarter, Keith Forman, President and CEO of Rentech, stated, "*We completed the previously announced replacements of problematic conveyors and other maintenance and repairs at our Atikokan and Wawa plants in the third quarter*. Atikokan is consistently operating at approximately 90% of capacity and we expect the plant to operate at an annualized rate of production of approximately 100,000 metric tons of pellets until such time that we have an economic justification to replace the last remaining bottleneck conveyors. *The new conveyors at Wawa are functioning as expected, with the plant producing at an annualized rate of approximately 150,000 metric tons of pellets. We are working to resolve some equipment and operating issues as we execute on our plan to ramp production at Wawa until we reach full capacity (400,000 to 450,000 metric tons annually), which is expected in late 2017*."

\*\*\*\*

Outlook

For 2016, Rentech expects Fulghum to generate EBITDA of $16 - $17 million and NEWP to generate EBITDA of $5-$6 million. NEWP's projected EBITDA is significantly lower than what the company would expect the business to generate in an environment with more normalized weather patterns.

Rentech expects the Atikokan plant to operate at approximately 90% of capacity or at approximately 100,000 metric tons of annualized wood pellet production until such time that we have an economic justification to replace the last remaining bottleneck conveyors.

*Rentech expects the Wawa facility to reach approximately 60% of production capacity within the next couple of quarters and anticipates reaching full capacity in the range of 400,000 – 450,000 metric tons of wood pellets in late 2017. At an annual production capacity of 400,000 metric tons, we would be able to*

> ***fulfill our yearly obligations under the Drax contract and generate positive cash flow at Wawa based on today's economic variables.*** However, we are currently evaluating our stabilized EBITDA forecast as Wawa continues ramping up production given that operating costs at Wawa have been higher than expected, and may continue to be so going forward, which negatively impacts profitability under the contract with Drax. In addition, oil prices, which drive indexation of prices in our Drax contract, have declined more than Canadian diesel prices, a material component of our fibre supply costs, which is negatively impacting margins on deliveries to Drax.

13.     The Company also held a conference call with investors on November 10, 2016. Defendant Forman spoke extensively on the functionality of the new equipment and the expected growth in production at the Wawa facility, as well as the increased performance at the Atikokan facility, stating, in pertinent part, as follows:

> With respect to Wawa, we completed startup and commissioning of the new conveyors at the facility last month, following an approximately 5.5 week shutdown that also included performing maintenance and repair work. The plant is currently achieving operating rates that annualized to approximately 150,000 metric tons of production, which is essentially the level achieved prior to the conveyor project.
>
> The new conveyors are functioning as expected, but we are working to resolve other equipment and operating challenges that have manifested themselves post turnaround. Throughout the ramp-up we are focused on ensuring that Wawa is able to sustain incrementally higher production rates with all of the new conveyors and equipment.

****

We expect the plant to reach approximately 60% of production capacity within the next couple quarters and anticipate reaching full capacity in the range of 400,000 to 450,000 metric tons late in the year.

****

I'll close out the discussion of Canada by noting that we're pleased with how well Atikokan is performing.

14.     During the Question and Answer portion of the conference call, Defendant Forman continued to make false and misleading statements about the Company's repaired operating facilities and the expected increase in production and profits in the coming quarters. In pertinent part, one exchange proceeded as follows:

**Unidentified Analyst**

Jeff, thanks for your service to the company and good luck in your future endeavors. I had a question about the industrial side, what is the level of production at Wawa for this -- for the division to be EBITDA breakeven?

**Keith Forman**

Jeff that's a question that we can't answer. We have a whole range of estimates to pick depending on the costs. So if you go back to the paradigm where diesel was, where it was in relationship to Brent two years ago and what the operating cost we expected to see without knowing how the plant was going to be, that number was probably in the 300,000 ton range.

But we're seeing first off that disconnect with the fuel was occurred and that's variably changes every month or every day quite honestly, but the way our indexing works, I think it's done on a quarterly retrospective basis.

But the thing that's really changed and made it less certain is the operating paradigm and we still have yet to operate anywhere near capacity. So we are seeing signs as we're operating more consistently that our costs as the way we operate now are not in line with being as profitable as we had hoped.

****

**Unidentified Analyst**

Okay. Maybe I'll it ask it a different way which is Q3 industrial segment lost money, had negative EBITDA and you will have talked about when Wawa does get to full capacity, you've talked about what the range would be in understanding that number might be influx, but it was a significantly positive number mid-teens Canadian EBITDA as my memory.

So the picture you're painting is that plant will ramp over the next 12 months, so at some point, you cross over from losses into breakeven and then you crossover into making money, how far away are we from that division breakeven and not being a drag on EBITDA?

**Keith Forman**

I don't have a date. I don't want to make anybody on this side of the phone call sound ignorant, but if certain factors change sooner, that date moves way towards us and if certain factors don't change, that date is out there and also provides -- also introduces other issues relative to, is this sustainable gold to strive for.

Do you go three or four, five more quarters in negative cash flow land before you get to quote unquote "the Nirvana number". So I think that's the equation that we're pursuing here and we're working hard. We've reorganized up North bringing in -- bringing in some external or briefing up our external bench, more empowering the plant

level folks eliminating some of the overhead there, but most important I think bringing into our shop, aspects of our operations that were previously contracted for.

So we've lowered the cost, made these functions part of our team and I'm hopeful that will work out and as I said, there's other aspects of our cost structure and revenue side that have yet to be resolved and if some of those push points have favorable outcomes from discussions we may or may not have, but hopefully will have that that dynamic can change meaningful.

We still are at Atikokan, our plant is profitable. It's actually pretty down close to where the numbers were originally set up a couple years ago. The plants lost my train of thought here, but we do have -- still have access to even in this market at very favorable cost of product. So I guess what I'm indicating is that there is headroom on what the value of what we make can be sold for in the pellet world longer-term.

**\*\*\*\***

**Unidentified Analyst**

Okay. And so it would seem to me that even if the plants not operating at full capacity, you don't have any planned downtime for Q4. So unless you have significantly planned downtime, doesn't seem like you have further inventory write-downs in the future; am I understanding that correctly?

**Keith Forman**

Until we get closer to capacity, our per ton cost would continue to be perhaps below selling price and it touches on the breakeven inflection point that you're asking about in that you reach that breakeven and you no longer experience LCM. So would expect to experience them until we get closer to that breakeven point.

15.    On November 10, 2016, Rentech filed its Form 10-Q quarterly report for the third quarter of 2016 with the SEC. The Company reported a decrease in revenue of $4.2 million and an increase in operating expenses of more than $5 million, as compared to quarter three in 2015. In the 10-Q, management stated that the Company's, "operating segments [had] been affected in different ways by various negative and positive factors in 2016" and that the "results and outlook for our Wood Pellets: Industrial segment depend primarily on operating results from the Atikokan and Wawa Facilities."

16.    The statements referenced above in ¶¶ 12-15 were each materially false and misleading because they failed to disclose and misrepresented the following adverse facts known by Defendant Forman during the Class Period:

(a)    That the issues with equipment and operating challenges had not been repaired and persisted;

(b)    That it would be necessary to suspend operations at the Wawa facility;

(c)    That Rentech would need to incur a significant asset impairment charge relating to the Wawa and Atikokan facilities in its fourth quarter 2016 results;

(d)    That Rentech was forced to explore strategic alternatives for the Wawa facility; and

(e)    As a result of the foregoing, Defendant Forman's positive statements about the Company's business, operations, and prospects, were false and misleading and/or lacked a reasonable basis at the time the statements were made.

## THE TRUTH IS REVEALED

17.    On February 21, 2017, prior to the market opening, Rentech issued a statement announcing the cease of production at the Company's Wawa facility and the reduction of operations and production at the Atikokan facility. The release stated, in pertinent part, as follows:

**Rentech Idles Wawa Facility; Exploring Strategic Alternatives**

February 21, 2017

Rentech, Inc. (**RTK**) announced today that its board has decided to idle the Wawa facility due to equipment and operational issues that would require additional unbudgeted capital investment. Today's decision also results from continued uncertainty around profitability on pellets produced at the facility, making additional investment in the facility uneconomic for Rentech at this time. Idling the plant will allow Rentech to conserve liquidity as it formally explores strategic alternatives for the plant including ongoing discussions with third parties. In conjunction with the strategic review of the Wawa facility, Rentech is also exploring strategic alternatives for the Company as a whole. In addition to these announcements, Rentech is providing updates on its other operating businesses.

Wawa Facility

As noted in prior communications, the Wawa facility experienced equipment and operating challenges

subsequent to the replacement of problematic conveyors last fall. These issues have persisted.

On February 16, 2017, our board made the decision to suspend operations at the facility. This decision is based in part on our review of the work by a third-party engineering firm to identify necessary capital improvements. While we believe that the issues we have been experiencing at the facility can be resolved with additional capital investments, we have concluded that it is not economical to pursue those investments or to continue to operate the facility at this time. Rentech's other businesses, including its Atikokan facility, continue to operate without interruption.

\*\*\*\*

Rentech expects to incur a significant asset impairment charge relating to the Wawa and Atikokan facilities in its fourth quarter 2016 results.

Updates on Other Businesses

Atikokan Facility

We are reducing production at the Atikokan facility to levels necessary to fulfill the delivery requirements under the Ontario Power Generation off-take contract. We expect the Atikokan facility to generate cash flow in the range of break-even to slightly positive in 2017 under this revised operating plan. Atikokan will no longer ship pellets to the Port of Quebec. We will continue to explore alternatives for selling additional pellets produced from the Atikokan facility to increase its utilization.

\*\*\*\*

Strategic Alternatives Review Process

Rentech intends to explore strategic alternatives for the Wawa facility and for the Company as a whole. In

conjunction with this process and to address potential future liquidity needs, Rentech is considering strategic alternatives that may include, but are not limited to, a sale of the Company, a merger or other business combination, a sale of all or a material portion of the Company's assets or a recapitalization.

Rentech has retained Wells Fargo Securities, LLC to assist in the strategic alternatives review process. The Company does not intend to disclose developments with respect to this review until either the Company's board has approved a definitive transaction, it is required to do so by law, or if such disclosure is deemed appropriate. The Company cautions that there is no guarantee that the strategic review will result in a transaction or if a transaction is undertaken, as to its terms or timing.

If an appropriate strategic alternative is not achieved on a timely basis, and if the Company were otherwise unable to secure additional sources of funds to address potential future liquidity needs, there could be a material adverse effect on the Company's business, results of operations, and financial condition. The Company had cash of approximately $20 million as of February 17, 2017 (excluding cash held by its operating subsidiaries in Canada and South America). In addition, the Company expects NEWP and Fulghum to generate positive cash flow and be self-sufficient from a liquidity perspective in 2017.

18.    Upon the release of the pre-trading news on February 21, the price of Rentech common stock plunged $1.31 per share, or 47.6%, as compared to market close on February 17, 2017, on unusually high trading volume of more than 3 million shares trading, or nearly 10x the average daily trading volume.

## NO SAFE HARBOR

19.    Most of the false and misleading statements related to existing facts or conditions, and the Safe Harbor provisions have no applicability to such statements. To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they too are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

20.    Rentech's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were also ineffective to shield those statements from liability.   Defendant Forman is liable for any false or misleading forward-looking statements because, at the time each forward-looking statements was made, the speaker knew the forward-looking statements was false or misleading and the forward-looking statements was authorized and/or approved by an executive officer and/or director of Rentech who knew that the forward-looking statements was false.  In addition, the forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statements would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## ADDITIONAL SCIENTER ALLEGATIONS

21.    As alleged herein, Defendant Forman acted with scienter in that he knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendant Forman, by virtue of his receipt of information reflecting the true facts regarding Rentech, his control over, and/or receipt of modification of Rentech's allegedly materially misleading misstatements and/or his associations with the Company which made them privy to confidential proprietary information concerning Rentech, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

22.    At all relevant times, the market for Rentech's common stock was an efficient market for the following reasons, among others:

(a)    Rentech's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    The Company had more than 23.19 million shares outstanding as of November 9, 2016.  During the Class Period, on average, 305,001 shares of

Rentech stock were traded on a daily basis, demonstrating a very active and broad market for Rentech stock and permitting a very strong presumption of an efficient market;

(c)     as a regulated issuer, Rentech filed periodic public reports with the SEC;

(d)     Rentech regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     Rentech was followed by many securities analysts who wrote reports that were distributed during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(f)     unexpected material news about Rentech was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

23.     As a result of the foregoing, the market for Rentech common stock promptly digested current information regarding Rentech from publicly available sources and reflected such information in Rentech's stock price. Under these circumstances, all purchasers of Rentech common stock during the Class Period suffered similar injury through their purchase of Rentech common stock at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

24.    During the Class Period, as detailed herein, Defendant Forman made false and misleading statements, and omitted material information, concerning Rentech's business fundamentals and financial prospects and engaged in a scheme to deceive the market.

25.    By artificially inflating and manipulating Rentech's stock price, Defendant Forman deceived Plaintiff and the Class and caused them losses when the truth was revealed.  Defendant Forman's prior misrepresentations and fraudulent conduct became apparent to the market on February 21, 2017, causing Rentech's stock price to fall precipitously as the prior artificial inflation came out of the stock price.  As a result of their purchases of Rentech securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

26.    This is a class action on behalf of those who purchased or otherwise acquired Rentech common stock between November 10, 2016 and February 20, 2017, inclusive, excluding Defendant Forman (the "Class").  Excluded from the Class are officers and directors of the Company as well as their families and the family of Defendant Forman.  Class members are so numerous that joinder of them is impracticable.

27.    Common questions of law and fact predominate and include whether Defendant Forman: (a) violated the Exchange Act; (b) omitted and/or misrepresented material facts; (c) knew or recklessly disregarded that their statements were false; (d) artificially inflated the price of Rentech common stock; and (e) the extent of and appropriate measure of damages.

28.    Plaintiff's claims are typical of those of the Class.   Prosecution of individual actions would create a risk of inconsistent adjudications.   Plaintiff will adequately protect the interests of the Class.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

29.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

30.    Throughout the Class Period, Defendants Rentech and Defendant Forman, in pursuit of their scheme and continuous course of conduct to inflate the market price of Rentech common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

31.    During the Class Period, Defendants Rentech and Defendant Forman, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Rentech common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (c) cause Plaintiff and other members of the Class to purchase Rentech common stock at inflated prices; and (d) cause them losses when the truth was revealed.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants Rentech and Defendant Forman, and each of them, took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.

32.    In addition to the duties of full disclosure imposed on Defendants Rentech and the Defendant Forman as a result of their affirmative false and misleading statements to the investing public, these Defendants had a duty to promptly disseminate truthful information with respect to Rentech's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's securities would be based on truthful, complete and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

33.    Defendants Rentech and Defendant Forman had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

34.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Rentech common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Rentech common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by Defendants Rentech and the Individual Defendants, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased Rentech stock during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

35.    Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by Defendants Rentech and the Defendant Forman, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Rentech shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

36.    By virtue of the foregoing, Defendants Rentech and Defendant Forman have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. 17 C.F.R. §240.10-5.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

37.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

38.    Defendant Forman had control over Rentech and made the material false and misleading statements and omissions on behalf of Rentech within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of his executive positions and stock ownership, as alleged above, Defendant Forman had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading.  Defendant Forman was provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

39.    In particular, Defendant Forman had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are

presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

40.    By reason of such wrongful conduct, Defendant Forman is liable pursuant to §20(a) of the Exchange Act.    As a direct and proximate result of Defendant Forman's wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other and further relief as the Court may deem just and proper.

# JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  February 23, 2017                **GLANCY PRONGAY & MURRAY LLP**

By: *s/ Robert V. Prongay*
Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:  (310) 201-9160
Email:        rprongay@glancylaw.com

**HOLZER & HOLZER, LLC**
Corey D. Holzer
Marshall P. Dees
Alexandria P. Rankin
1200 Ashwood Parkway, Suite 410
Atlanta, GA  30338
Telephone:  (770) 392-0090
Facsimile:  (770) 392-0029

*Attorneys for Plaintiff*

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows - **List additional transactions on Schedule A, if necessary**:

Purchases:

| Ticker of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| RTK | Jan 23,2017 | 10,010 | 21,321.55 |
| | Jan 31,2017 | 6,000 | 15,209.45 |

Sales:

| Ticker of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|
| RTK | Feb 14,2017 | 6,000 | 17,031.58 |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

N/A

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __22__ day of __February__, 2017 in ___Saskatoon___, ___saskatchewan___.

City                         State

(Signature) X_____

(Print Name)_____Cheng Jiangchen_____