**GLANCY PRONGAY & MURRAY LLP**
LIONEL Z. GLANCY (#134180)
ROBERT V. PRONGAY (#270796)
EX KANO S. SAMS II (#192936)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: esams@glancylaw.com

**HOLZER & HOLZER, LLC**
COREY D. HOLZER
MARSHALL P. DEES
ALEXANDRIA P. RANKIN
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029

*Lead Counsel for Lead Plaintiff*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHENG JIANGCHEN, Individually and on Behalf of All Others Similarly Situated,<br>Plaintiff,<br>vs.<br>RENTECH, INC., KEITH B. FORMAN, and JEFFREY SPAIN,<br>Defendants. | Case No. 2:17-cv-01490-GW-FFM<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Lead Plaintiff Ichiro Ikuno ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Rentech, Inc. ("Rentech" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports, and other public statements issued by, or about, the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons and/or entities who purchased or acquired the Company's common stock between March 15, 2016 and April 6, 2017, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

4. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

5. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange located in this District.

## PARTIES

6. As set forth in the previously-filed certification which is incorporated by reference herein, Plaintiff purchased the Company's common stock during the Class Period and has been damaged thereby.

7. Defendant Rentech is a California corporation with its principal executive offices located in Los Angeles, California. As of December 31, 2016, Rentech had 606 non-unionized and salaried employees, and 19 unionized employees. Rentech is a renewable energy company that specializes in the processing and manufacturing of wood fibre and nitrogen fertilizer.

8. Defendant Keith B. Forman ("Forman") is, and was at all relevant times, the President and Chief Executive Officer ("CEO") of Rentech and a member of its Board of Directors.

9. Defendant Jeffrey Spain ("Spain") is, and was at all relevant times, the Chief Financial Officer ("CFO") of Rentech from December 2015 to November 2016. Defendant Spain previously served as Rentech's Senior Vice President of Finance, Accounting and Administration for Rentech's wood fibre group immediately prior to his appointment as CFO. Defendant Spain also held various senior financial and accounting roles at Rentech, and his senior accounting and finance executive experience spans nearly 20 years. Defendant Spain received his Masters of Business Administration from the Anderson Graduate School of Management at UCLA and earned a Bachelor's degree in Finance from Southern Methodist University.

10. Defendants Rentech, Forman, and Spain are collectively referred to herein as "Defendants." Defendants Forman and Spain are collectively referred to herein as the "Individual Defendants."

11. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of the Company, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects. Additionally, as set forth more fully below, the Individual Defendants had access to material adverse non-public information concerning the Company. Because of their positions within the Company, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business

prospects via internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

12. The Individual Defendants are liable as direct participants in the wrongs alleged herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct alleged. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

13. The Individual Defendants, because of their positions within the Company, controlled and/or possessed the authority to control the contents of the Company's reports, press releases, and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged to be misleading herein, prior to, or shortly after, their issuance and had the ability and opportunity to

prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

14. The Individual Defendants, as senior executive officers and/or directors – and as controlling persons of a publicly-traded company whose common stock was, and is, governed by the federal securities law – had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud and/or deceit on purchasers of the Company's common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. This scheme: (1) deceived the investing public regarding the Company's business, operations and management, and the intrinsic value of the Company's common stock; (2) enabled the Company to obtain additional capital at favorable prices, create a public market for its common stock, and gain access to the public equity markets; and (3) caused Plaintiff

and members of the Class to purchase the Company's common stock at artificially inflated prices.

## BACKGROUND ALLEGATIONS

16. Rentech is a production and manufacturing company that focuses on renewable energy technologies. The Company specializes in the production and utilization of wood fibre into various high-value products, such as wood pellets and wood chips.

17. Rentech's wood fibre processing business primarily consists of wood chipping services to the pulp, paper and packaging industry. Rentech also produces wood pellets for the utility and industrial power generation market and the residential and commercial heating markets.

18. The Company's wood-chipping business – Fulghum Fibres ("Fulghum") – provides wood-yard operations services and wood-chipping services, and produces and sells wood chips to the pulp, paper and packaging industry. The majority of Fulghum's customers are large pulp, paper and packaging manufacturers who provide wood that Fulghum processes into wood chips at the Company's mills, which are then used to manufacture products such as boxboard, containerboard, fluff, kraftliner, dissolving pulp, paper, and medium-density fiberboard for building products. Fulghum generates revenue primarily from fees under exclusive processing agreements. Each of the Company's United States mills typically operated under an exclusive processing agreement with a single customer. At these

mills, Fulghum is paid a processing fee based on tons processed, with minimum volume base rates and a reduced fee rate for higher volumes. In most cases, if the customer fails to deliver the minimum contracted log volume for processing, it must pay a shortage fee to Fulghum, which is typically lower than the base rate. Under the Company's processing agreements, the customer generally has the opportunity to make up for any shortfall below minimum volume requirements with additional volumes in subsequent months before it is required to pay a shortfall fee. Shortfall fees are typically settled quarterly.

19. Rentech also produces industrial wood pellets that are used in larger scale power generation facilities. Rentech's wood pellets are subject to specific product quality standards, which include energy density, ash content, durability index, fines content, chemical content and grindability as both electric utilities and government regulators have established standards for wood pellets used in renewable energy. Proof of biomass sustainability and independent verification of feedstock supply are also requirements to sell wood pellets to European utilities.

20. Before the start of the Class Period, Rentech operated two wood pellet facilities – one in Wawa, Ontario, Canada, and the other in Atikokan, Ontario, Canada. When fully operational, the Company's facility in Atikokan was expected to produce up to 110,000 metric tons of wood pellets annually, while the facility in Wawa was expected to produce up to 400,000 to 450,000 metric tons annually. During the ramp up of both facilities, however, Rentech discovered the need to

modify certain systems to reach full capacity. Rentech completed repairs to the Atikokan facility's faulty conveyor system at the end of 2015, and indicated in public filings that the remaining problems were expected to be repaired by mid-2016.

21. Rentech's Wawa facility required modifications to the front-end system of the facility that handles logs and feeds them into the chipping process and modification or replacement of a significant portion of the plant's conveyance systems. The modifications of the front-end system and the first phase of modifications of the plant's conveyance systems were completed in late 2015. The remaining work to the conveyor systems was scheduled to be completed by mid-2016. Despite these issues, Rentech told investors that when it applied a range of assumed operating efficiencies typical for the industry, the Wawa plant's annual production capacity would be between 400,000 and 450,000 metric tons. According to the Company, the low end of this capacity range would still allow Rentech to fulfill its annual contractual obligations to Drax Power Limited ("Drax") to provide 72,000 metric tons of wood pellets and still generate positive cash flow.

22. In 2013, Rentech entered into a ten-year take-or-pay contract to provide Drax with 72,000 metric tons of wood pellets annually. In August 2015, Rentech amended that contract to cancel all 2015 wood pellet deliveries due to problems at the wood pellet facilities. Rentech incurred a penalty of $2.6 million associated with costs for Drax to purchase replacement pellets and to cancel shipping

commitments, which was reflected in the Company's 2015 operating expenses. The Company also agreed to provide Drax with 72,000 metric tons of wood pellets in 2018 and 2019 at 2015 rates, which was expected to be lower than the pricing in those future years under the original contract terms.

23. In January 2016, Rentech shipped 28,000 metric tons of wood pellets from the Port of Quebec to Drax, and in March 2016, Rentech shipped 20,000 metric tons from the same port, which was smaller than its obligation to Drax going forward. While these initial shipments originated from both the Wawa and Atikokan facilities, the Company also had entered a ten-year take-or-pay agreement with another customer to provide up to 90,000 metric tons of wood pellets annually from Atikokan. Any remaining pellets produced by the Atikokan facility would be shipped to Drax, but the Wawa facility was expected to supply the majority the production required under the contract with Drax going forward.

## SUBSTANTIVE ALLEGATIONS

24. On March 15, 2016, Rentech filed its Form 10-K for the fiscal year ended December 31, 2015. Within the Company's 2015 Form 10-K, the Company stated the following regarding the customers for its wood-chipping business – Fulghum:

> Most of our mills operate under multi-year contracts with the majority of total processing volume contracted through 2018 with some continuing beyond 2018 until 2028. Five mills in the United States representing over 50% of our United States volume and two mills in Chile representing 44% of our South American volume are under contract through 2018 and beyond. Six of our mills located in the United States and two of our mills located in South America have

contracts that are renegotiated annually. One of our mills located in the United States provides wood chips to its customer on an as-needed basis on the spot market. We own 20 of the 32 mills we operate in the United States and South America. ***For certain of the mills that we own, the customer has an option to purchase the mill for a pre-determined price. For each of the mills that we do not own but operate under an agreement with the customer, the customer can terminate the agreement with prior written notice (in most cases, the processing agreements require 90 days' prior written notice). Historically, very few of our customers exercised purchase options or terminated agreements prior to their expiration. Only four contracts with Fulghum's U.S. customers have been terminated prior to their expiration in the last 20 years (three due to mill closures and one associated with a customer buy-out in 1995).***

During 2015, approximately 72% of the log volume we processed in the United States was for five customers at 15 mills, as listed below.

| **Customer** | **Number of Mills** | **% of United States Volume** | **Weighted Average Remaining Contractual Life in Years**[1] |
|---|---|---|---|
| WestRock | 8 | 20% | 1.5 |
| Graphic Packaging | 2 | 17% | 3.9 |
| Packaging Corp. of America | 1 | 14% | 12.9 |
| Weyerhaeuser | 2 | 11% | 1.0 |
| Georgia-Pacific | 2 | 10% | 1.7 |

25. The above statements were false and misleading because Defendants knew at the time Defendants described the limit history of customers exercising options to purchase wood chipping mills owned by Rentech, that at least one customer of Fulghum had notified Defendants of its intent to exercise its option to purchase two wood-chipping mills that Fulghum operated for the customer. During Rentech's March 16, 2017 conference call to discuss the Company's financial

[1] As of December 31, 2015.

results for the fourth quarter and full year of 2016, Defendant Forman admitted that Defendants were notified "over a year ago" – *i.e.* before March 15, 2016 – that a customer of Fulghum indicated its intent to exercise its option to purchase two wood-chipping mills that Fulghum operated for the customer. These mills contributed approximately $4 million of EBITDA in 2016. As a result of the exercise of the purchase option, Rentech expected the loss of these mills to negatively impact operating income and cash flow in the second half of 2017 and going forward. The above statements were also false and misleading because Defendants failed to disclose material details regarding the Fulghum contracts. Although Rentech listed more generic details regarding the Fulghum contracts within the Company's SEC filings – such as which facilities were leased and owned and the tenure of the contracts – Defendants failed to provide critical information regarding such contracts that would have altered the total mix of information available to analysts and investors. For example, such information included whether or not operating fees were embedded in the contracts, information regarding profit per ton, and information regarding the recovery of capital invested. This information regarding the Company's Fulghum contracts was material to analysts and investors, and yet Defendants failed to provide such information to enable investors to assess their investment decisions.

26. On August 10, 2016, Rentech issued a press release announcing the Company's results for the second quarter of 2016. Rentech announced second

quarter earnings per share of $12.95 and revenue of $31.8 million versus $39.9 million in the prior year period. Defendants also announced that the Company was preparing to shut down its Wawa facility in the following days to replace remaining problematic conveyors and to complete mechanical upgrades. Rentech announced further that once the Company's Wawa facility was again operational, Defendants expected the Wawa facility to ramp up from approximately 40% capacity to approximately 70% capacity over the next several quarters. Specifically, the Company's August 10, 2016 press release stated the following:

> Rentech, Inc. (NASDAQ: RTK) today announced financial and operating results for the second quarter of 2016.
>
> Commenting on the quarter, Keith Forman, President and CEO of Rentech, stated, "Production improved during the second quarter at our Canadian pellet plants, with average weekly production increasing by 50% and 10% at Wawa and Atikokan, respectively, as compared to the average weekly production during the first quarter. ***I feel that we have a good handle on the remaining issues that need to be resolved in order to further increase production at both plants. We are preparing to shut down the Wawa facility in the next few days to replace the remaining problematic conveyors and complete mechanical upgrades, maintenance and repairs at the plant***. Once we bring the plant back online, we expect Wawa to ramp from approximately 40% of capacity to approximately 70% over the next several quarters."
>
> Mr. Forman continued, "At Fulghum, U.S. and South American volumes for the second quarter were lighter than the prior year period but combined performance for the first half of 2016 is generally tracking to that of 2015. We still expect Fulghum's results for the year to be lower than the record performance in 2015 given the previously announced loss of a mill contract. . . ."
>
> * * *
>
> **Summary of Results**
>
> The consolidated results consist of Fulghum Fibres (Fulghum), New England Wood Pellet (NEWP), Industrial Wood Pellets, which includes our Canadian pellet plants, and unallocated corporate expenses. ***The former Rentech Nitrogen Pasadena and East Dubuque facilities are classified as discontinued operations due to the disposition of those businesses on March 14, 2016 and April 1, 2016, respectively.***

* * *

> ***During the second quarter of 2016, Rentech recorded a book gain of $358.6 million in discontinued operations on the sale of Rentech Nitrogen Partners (RNP)***. The gain is comprised primarily of $59.8 million of cash proceeds and CVR Partners (CVR) common units valued at $202.1 million, based on CVR's closing price on March 31, 2016 of $8.36 per unit, compared to the company's share of RNP's negative net book value of $97.6 million as of March 31, 2016.
>
> * * *
>
> ***Fulghum Fibres***
>
> ***Revenues were $20.8 million for the second quarter of 2016, compared to $25.7 million for the same period last year. Revenues from operations in the United States were $12.4 million for the second quarter of 2016, as compared to $14.8 million in the prior year period. Revenues from operations in South America were $8.4 million for the second quarter of 2016, as compared to $10.9 million in the prior year period. The decrease in revenues from the United States operations is due to the previously announced sale of a mill in April 2016 and regional flooding impacting two paper mill facilities of our customers, reducing demand for wood chips from Fulghum's mills. The decrease in South America revenues was primarily due to lower biomass product sales in South America and chip sales to Asia in the second quarter of 2016 as compared to 2015.***
>
> * * *
>
> ***Wood Pellets: Industrial***
>
> Revenues were $6.5 million for the second quarter of 2016, earned by delivering approximately 56,000 metric tons of wood pellets. Revenues were $2.5 million for the second quarter of 2015, earned by delivering approximately 13,500 metric tons of wood pellets.
>
> Gross loss for the second quarter of 2016 was $(5.2) million, compared to $(3.1) million for the same period in the prior year. Gross loss margin was (80)% for the second quarter of 2016, compared to (120)% for the same period in the prior year. ***The increased gross loss in 2016 was due to higher sales volumes at production costs that exceed sales prices as the Atikokan and Wawa Facilities are ramping up,*** including the related write-down of inventory by $5.2 million during the second quarter of 2016, and considerably higher depreciation expense in the second quarter of 2016 than in the second quarter of 2015.

27. Additionally, Rentech held a conference call for analysts and investors on August 10, 2016 to discuss the Company's financial results for the second

quarter of 2016. During the conference call, Defendants made the following representations:

> **Keith Forman**
>
> [I'll] [s]tart by discussing the status of our Canadian pellet facilities production increased at both Wawa and Atikokan over the past quarter and ***our production cost per metric ton is improving. I feel that we have a good handle on the remaining issues that need to be resolved in order to further increase production at both plants***.
>
> * * *
>
> The team is now tackling a number of mechanical improvements identified by the site personnel and the independent engineering firm engaged to assist us during ramp up. ***We plan to take the plant down beginning August 15 next Monday for approximately two to four weeks to complete some of these mechanical upgrades to replace the remaining defective conveyors*** on the dry side of the plant and to conduct general repairs and maintenance.
>
> These improvements should remove the remaining identified conveyance bottlenecks [enabling] the plant to resume ramping up with the expectations of reaching 70% of capacity over the next several quarters.
>
> **Jeffrey Spain**
>
> I'll start by mentioning that you may have seen our 12b-25 filings this morning regarding the delayed [filing] of our 10-Q. We do expect to file the Q within the next handful of days after completing a review of a GAAP tax provision allocations between discontinued and continued operations for the quarter and the six months ended June 30 of last year. ***We do anticipate that the review will not result in any changes to the financial statements included in our press release issued today.***
>
> * * *
>
> ***We recorded a pretax gain on the sale of Rentech Nitrogen of $358.6 million which was booked in discontinued operations***. This gain was comprised of cash proceeds of approximately $60 million in common units of CVR Partners valued at $202 million based on CVR's closing price on March 31. These values were compared to Rentech Nitrogen's net book value excluding the capacity in holdings which was a negative $97.6 million.
>
> **Brent Rystrom**
>
> Can you give us a little more color on Wawa and thinking in the context of how you spoke in the call and how the press release rewarded? ***Are you still concerned that the plant won't hit its nameplate capacity?*** Or you getting more comfortable that it will?

**Jeffrey Spain**

***No we're getting more comfortable*** [] and that's why you know I hate to say when we do a thousand, if we do thousand in a shift that's the ability to do theoretically 365,000 tons.

* * *

What I will – what I do want to impress upon people is that why I feel more confident is in that the list of things get shorter every day. Let's say we start the week with 25 things to do. We may end the week with 25 things to do, but only five of those are carryovers we've done 20 and then 20 more short comings or inefficiencies show up.

* * *

So that may sound discomforting but ***to me it's comforting because we seem to have a methodology to get our hands around problems as to when something is amiss*** when an alarm goes off or a signal comes to the control room it says hey this is not functioning properly. ***We immediately have the ability to go hey it's probably one of these three things, let's check over here, let's look here and we're back on line a lot quicker***.

28. These announcements sent Rentech shares soaring more than 20% in a day, and over 50% in seven trading days.

29. The statements referenced above were each materially false and misleading because they failed to disclose, and materially misrepresented, the following adverse facts known by Defendants during the Class Period:

(a) Defendants knew that the Wawa facility was essentially a stranded asset. Indeed, the distance from the Wawa facility to the operating port in Quebec City was approximately 684 miles. In fact, when Rentech held a conference call with analysts and investors on March 16, 2017, Defendant Forman admitted that Defendants knew about the distance between the Wawa facility to the operating port in Quebec City "when the original brownfield conversion occurred." Defendants, moreover, failed to disclose that the port

for the Wawa facility was originally intended to be in Montreal, not Quebec City. The distance from the Wawa facility to Quebec City was so far that it essentially rendered the Wawa facility a stranded asset incapable of adequately operating as Defendants represented;

(b) Defendants knew that the challenges posed by the distance between the Company's Wawa facility and the operating port in Quebec City would be compounded by the conveyance issues that the Company experienced – problems that Rentech experienced at both the Atikokan and Wawa facilities. For example, Defendants were aware that, contrary to their representations, modification or replacement of a significant portion of Wawa's conveyance systems would not adequately address design flaws in the conveyance system at the Wawa facility – design issues that were exacerbated by the lengthy distance between the Wawa facility and the operating port in Quebec City. Defendants also knew that the problematic conveyors and other maintenance and repairs that were performed at the Atikokan and Wawa facilities would continue to cause operational problems because such repairs did not ameliorate such design flaws and other inherent conveyance issues at the Atikokan and Wawa facilities. Defendants knew, therefore, that the issues with equipment and operating challenges had not been repaired, but rather persisted throughout the Class Period;

(c) Defendants failed to disclose material details regarding the Fulghum contracts. Although Rentech listed more generic details regarding the Fulghum contracts within the Company's SEC filings – such as which facilities were leased and owned and the tenure of the contracts – Defendants failed to provide critical information regarding such contracts that would have altered the total mix of information available to analysts and investors. For example, such information included whether operating fees were embedded in the contracts, information regarding profit per ton, and information regarding the recovery of capital invested. This information regarding the Company's Fulghum contracts was material to analysts and investors, and yet Defendants failed to provide such information to enable investors to assess their investment decisions;

(d) the pretax gain resulting from the Rentech Nitrogen sale was materially overstated because the Company suffered from material weaknesses in financial reporting and did not perform certain procedures over the allocation of the GAAP tax provision between continuing and discontinued operations in the second quarter of 2016 in accordance with its designed controls; and

(e) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and misleading and/or lacked a reasonable basis at the time the statements were made.

30. Also on August 10, 2016, Rentech: (1) filed for a non-timely 10-Q SEC filing; (2) announced that the Company had not yet completed review of GAAP tax provision allocations between discontinued operations and continuing operations for the Company's June quarter; and (3) stated that the Company expected to file its Form 10-Q as soon as practicable upon completing its review of the GAAP tax allocation.

31. On August 15, 2016, Rentech filed its Form 10-Q for the quarterly period ended June 30, 2016. Within Rentech's Form 10-Q, the Company recorded adjustments to deferred tax assets and liabilities during the three months ended June 30, 2016. Among other things, the Company reported the following:

> ***On April 1, 2016, RNP completed the previously announced transactions contemplated by the Agreement and Plan of Merger, dated as of August 9, 2015 (the "Merger Agreement") under which RNP and Rentech Nitrogen GP, LLC (the "General Partner") merged with affiliates of CVR Partners, L.P. ("CVR"), and RNP ceased to be a publicly traded company and became a wholly-owned subsidiary of CVR (the "Merger"). Pursuant to the Merger Agreement, each outstanding unit of RNP was exchanged for 1.04 common units of CVR ("CVR Common Units") and $2.57 of cash. The Company received merger consideration of $59.8 million of cash and 24.2 million CVR Common Units. The Company used 17.0 million CVR Common Units received in the Merger and $10.0 million of cash to: (i) repurchase and retire all $100 million of the Company's Series E Convertible Preferred Stock, par value $10.00 per share (the "Preferred Stock") held by certain funds managed by or affiliated with GSO Capital Partners LP (the "GSO Funds") and (ii) repay approximately $41.7 million of debt under the Company's credit agreement with the GSO Funds (as amended from time to time, the "GSO Credit Agreement").***
>
> ***The Company currently owns approximately 7.2 million CVR Common Units. The Company's share of book gain on sale of RNP is $358.6 million, which is recorded in discontinued operations. The gain is comprised primarily of $59.8 million of cash proceeds and CVR Common Units valued at $202.1 million, based on CVR's closing price on March 31, 2016 of $8.36 per unit, compared to the Company's share of RNP's negative net book value of $97.6 million as of March 31, 2016.***

The Company has presented its consolidated balance sheets and consolidated statements of operations for all periods presented in this report to reflect RNP as discontinued operations, excluding certain corporate expenses that the Company expects to incur on an on-going basis which were previously allocated to RNP.

* * *

For the three months ended June 30, 2016, the Company recorded an income tax expense of $22.7 million, consisting of a $109.5 million income tax benefit in continuing operations and a $132.2 million income tax expense in discontinued operations. For the six months ended June 30, 2016, the Company recorded an income tax expense of $23.5 million, consisting of a $111.9 million income tax benefit in continuing operations and a $135.4 million income tax expense in discontinued operations. ***The allocation to discontinued operations was determined using the incremental method by subtracting the benefit that was generated from continuing operations from the provision for the Company as a whole.*** The Company's effective income tax rate (income tax benefit as a percentage of loss from continuing operations before income taxes) was -349% for the six months ended June 30, 2016. The difference between the United States federal statutory rate of 35% and the effective rate primarily was attributable to the outside basis difference in foreign subsidiaries, impact of foreign earnings, impact of state taxes, utilization of net operating loss ("NOL") carryforwards, research and development ("R&D") credits and alternative minimum tax ("AMT") credits.

***Due to the gain on sale of RNP during the three months ended June 30, 2016, the Company utilized all of the federal NOL carryforwards, R&D credits and AMT credit carryforwards. The Company released $79.5 million of valuation allowance and this resulted in a tax benefit for continuing operations.*** For state tax purposes, there are remaining deferred tax assets of $1.9 million for which the Company has considered results of operations and concluded that it is more likely than not that the state deferred tax assets will not be realized.

* * *

***Net cash used in operating activities – discontinued operations for the six months ended June 30, 2016 was $114.2 million. We had net income – discontinued operations of $232.2 million for the six months ended June 30, 2016, which includes $358.6 million for our share of the book gain on sale of RNP, and was partially offset by income tax expense of $135.4 million.***

***Net cash provided by operating activities – discontinued operations for the six months ended June 30, 2015 was $39.5 million. We had net loss – discontinued operations of $56.0 million for the six months ended June 30, 2015.***

* * *

Net cash used in financing activities was $5.2 million for the six months ended June 30, 2016, compared to net cash provided by

> financing activities of $43.0 million for the same period in the prior year. During the six months ended June 30, 2016, we borrowed $23.8 million under various credit agreements. During the period, we made debt payments of $14.2 million, and RNP made cash distributions to holders of noncontrolling interests of $3.3 million. ***We also used $10.0 million, along with CVR Common Units valued at $97.1 million to repurchase the Preferred Stock. CVR Common Units valued at $45.0 million were used to pay down $41.7 million under the GSO Credit Agreement.***
>
> * * *
>
> ***On April 1, 2016, RNP completed the Merger with CVR. We received merger consideration of $59.8 million of cash and 24.2 million CVR Common Units. We used 17.0 million CVR Common Units and $10.0 million of cash to: (i) repurchase and retire all $100 million of our Preferred Stock held by the GSO Funds and (ii) repay approximately $41.7 million of debt under the GSO Credit Agreement.***

32. The above statements were false and misleading because, as Defendants admitted within Rentech's Form 8-K filed on April 4, 2017, the Company's consolidated financial statements for the three and six months ended June 30, 2016 should no longer be relied upon:

> On March 29, 2017, the Audit Committee of the Board of Directors of Rentech concluded ***that the Company's consolidated financial statements for the three and six months ended June 30, 2016 and the three and nine months ended September 30, 2016 included in the Company's Form 10-Q for the periods ended June 30, 2016 and September 30, 2016, respectively, should no longer be relied upon*** for the reasons described below.
>
> The Company plans to include financial information detailing the restatement for the interim three and six month periods ended June 30, 2016 and the three and nine month periods ended September 30, 2016 in its annual report on Form 10-K for the year ended December 31, 2016. ***The Company is restating these financial statements to correct errors in its provision for income taxes involving non-cash deferred taxes and the allocation of tax benefit and tax expense between continuing operations and discontinued operations***.
>
> On April 1, 2016, Rentech completed the merger of Rentech Nitrogen Partners, L.P. ("RNP") into CVR Partners, L.P. ("CVR"). Pursuant to the merger agreement, each outstanding unit of RNP was exchanged for 1.04 common units of CVR ("CVR Common Units") and $2.57 of cash. The Company received merger consideration of $59.8 million of cash and 24.2 million CVR Common Units. The Company used 17.0 million CVR Common Units received in the merger and $10.0 million of cash to: (i) repurchase and retire all $100 million of the Company's Series E Convertible Preferred Stock held by certain funds managed by

> or affiliated with GSO Capital Partners LP (the "GSO Funds") and (ii) repay approximately $41.7 million of debt under the Company's credit agreement with the GSO Funds. Following the merger and related transactions, the Company owns approximately 7.2 million CVR Common Units.
>
> The Company recorded adjustments to deferred tax assets and liabilities related to the merger during the three months ended June 30, 2016. Based upon further review of the accounting for the transaction in connection with the preparation of its financial statements for the year ended December 31, 2016, ***the Company determined that a book and tax basis difference existed of approximately $60 million related to the investment in CVR immediately following the transaction. The Company has therefore concluded that it should have recorded a non-cash deferred tax liability, which would have resulted in approximately $21.3 million of additional income tax expense in the quarter and six months ended June 30, 2016 and approximately $19.9 million of additional tax expense for the nine months ended September 30, 2016*** (due to a reduction of approximately $1.4 million in income tax expense for the three months ended September 30, 2016).
>
> ***The Company has also determined that the allocation of tax benefit and expense between continuing operations and discontinued operations for the affected periods should be amended due to the release of a valuation allowance that was improperly classified***. The change in allocation of this item does not impact consolidated net income. ***The Company expects income tax benefit from continuing operations and income tax expense from discontinued operations to be reduced by approximately $100 million and $80 million***, respectively, for the three and six months ended June 30, 2016, as well as the nine months ended September 30, 2016 ***due to the classification error of the valuation allowance release and the need to record the deferred tax liability for the CVR Common Units received in the merger transaction***.

33. Defendants, moreover, knew that the above statements were false and misleading – or were deliberately reckless in not knowing – because of the magnitude of the errors in the Company's provision for income taxes involving non-cash deferred taxes and the allocation of tax benefit and tax expense between continuing operations and discontinued operations. Indeed, the Company determined that a book and tax basis difference existed of ***approximately $60 million*** related to the investment in CVR immediately following the transaction.

The Company also determined that it should have recorded a non-cash deferred tax liability, which would have resulted in approximately $21.3 million of additional income tax expense in the quarter and six months ended June 30, 2016 and approximately $19.9 million of additional tax expense for the nine months ended September 30, 2016. Additionally, the simplicity of the relevant accounting standards, the severity of the problems with Rentech's internal controls and disclosure controls and procedures, and the fact that Defendant Spain had extensive accounting experience further demonstrate that Defendants were aware of, or were deliberately reckless in not knowing, of these accounting issues.

34. On November 3, 2016, Rentech issued a press release announcing Paul Summers as the Company's new CFO effective November 11, 2016. Summers served as Rentech's Vice President and Treasurer immediately prior to his appointment as CFO. This change followed the resignation of former CFO Defendant Spain, who held the position for less than one year.

35. On November 9, 2016, Rentech filed its Form 10-Q quarterly report for the quarterly period ended September 30, 2016 with the SEC. The Company reported a decrease in revenue of $42 million, and an increase in operating expenses of more than $5 million, as compared to the third quarter of 2015. In the Form 10-Q, Defendants stated, among other things, that the Company's "operating segments [had] been affected in different ways by various negative and positive factors in

2016" and that the "results and outlook for our Wood Pellets: Industrial segment depend primarily on operating results from the Atikokan and Wawa Facilities."

36. Also within Rentech's Form 10-Q for the quarterly period ended September 30, 2016, the Company recorded adjustments to deferred tax assets and liabilities during the period ended September 30, 2016. Among other things, the Company reported the following:

> On April 1, 2016, RNP completed the previously announced transactions contemplated by the Agreement and Plan of Merger, dated as of August 9, 2015 (the "Merger Agreement") under which RNP and Rentech Nitrogen GP, LLC (the "General Partner") merged with affiliates of CVR Partners, L.P. ("CVR"), and RNP ceased to be a publicly traded company and became a wholly-owned subsidiary of CVR (the "Merger"). ***Pursuant to the Merger Agreement, each outstanding unit of RNP was exchanged for 1.04 common units of CVR ("CVR Common Units") and $2.57 of cash. The Company received merger consideration of $59.8 million of cash and 24.2 million CVR Common Units. The Company used 17.0 million CVR Common Units received in the Merger and $10.0 million of cash to: (i) repurchase and retire all $100 million of the Company's Series E Convertible Preferred Stock, par value $10.00 per share (the "Preferred Stock") held by certain funds managed by or affiliated with GSO Capital Partners LP (the "GSO Funds") and (ii) repay approximately $41.7 million of debt under the Company's credit agreement with the GSO Funds (as amended from time to time, the "GSO Credit Agreement").***
>
> ***The Company currently owns approximately 7.2 million CVR Common Units. The Company's share of book gain on sale of RNP is $358.6 million, which is recorded in discontinued operations. The gain is comprised primarily of $59.8 million of cash proceeds and CVR Common Units valued at $202.1 million, based on CVR's closing price on March 31, 2016 of $8.36 per unit, compared to the Company's share of RNP's negative net book value of $97.5 million as of March 31, 2016.***
>
> The Company has presented its consolidated balance sheets and consolidated statements of operations for all periods presented in this report to reflect RNP as discontinued operations, excluding certain corporate expenses that the Company expects to incur on an on-going basis which were previously allocated to RNP.
>
> * * *
>
> For the three months ended September 30, 2016, the Company recorded an income tax benefit of $3.1 million, consisting of a $6.8

million income tax benefit in continuing operations and a $3.7 million income tax expense in discontinued operations. For the nine months ended September 30, 2016, the Company recorded an income tax expense of $20.4 million, consisting of a $118.7 million income tax benefit in continuing operations and a $139.1 million income tax expense in discontinued operations. ***The allocation to discontinued operations was determined using the incremental method by subtracting the benefit that was generated from continuing operations from the provision for the Company as a whole.*** The Company's effective income tax rate (income tax benefit as a percentage of loss from continuing operations before income taxes) was 244% for the nine months ended September 30, 2016.

* * *

***Due to the gain on sale of RNP during the nine months ended September 30, 2016, the Company utilized all of the federal NOL carryforwards and a portion of the R&D credits. The Company released $79.5 million of valuation allowance and this resulted in a tax benefit for continuing operations. For state tax purposes, there are remaining deferred tax assets of $1.9 million for which the Company has considered results of operations and concluded that it is more likely than not that the state deferred tax assets will not be realized.***

* * *

In the Consolidated Statements of Operations included in Form 10-Q for the quarterly period ended June 30, 2016, the Company incorrectly reported income tax expense between continuing and discontinued operations for the three and six months ended June 30, 2016. Income tax benefit included in income from continuing operations, net of tax was understated by $2.5 million and income tax expense included in income from discontinued operations, net of tax, was understated by $2.5 million. The total tax expense for the three and six months ended June 30, 2016 was correctly reported. There was no impact on gross profit, operating income, net income, cash flows or the balance sheet. Management does not believe the impact of these errors was material for the second quarter of 2016 or the previously issued Form 10-Q. ***The Company has corrected the income tax (benefit) expense between continuing and discontinued operations in the three months ended September 30, 2016, which had no impact on gross profit, operating income, net income, cash flows or the balance sheet***.

* * *

Net cash used in operating activities – discontinued operations for the nine months ended September 30, 2016 was $0.5 million. We had net income – discontinued operations of $231.8 million for the nine months ended September 30, 2016, which includes $358.6 million for our share of the book gain on sale of RNP, and was partially offset by income tax expense of $139.1 million.

Net cash provided by operating activities – discontinued operations for the nine months ended September 30, 2015 was $89.3 million. We had

> net loss – discontinued operations of $78.4 million for the nine months ended September 30, 2015.
>
> * * *
>
> Net cash used in financing activities was $10.7 million for the nine months ended September 30, 2016, compared to net cash provided by financing activities of $22.6 million for the same period in the prior year. During the nine months ended September 30, 2016, we borrowed $24.3 million under various credit agreements. During the period, we made debt payments of $20.2 million, and RNP made cash distributions to holders of noncontrolling interests of $3.3 million. ***We also used $10.0 million, along with CVR Common Units valued at $97.1 million, to repurchase the Preferred Stock. CVR Common Units valued at $45.0 million were used to pay down $41.7 million under the GSO Credit Agreement.***
>
> * * *
>
> ***On April 1, 2016, RNP completed the Merger with CVR. We received merger consideration of $59.8 million of cash and 24.2 million CVR Common Units. We used 17.0 million CVR Common Units and $10.0 million of cash to: (i) repurchase and retire all $100 million of our Preferred Stock held by the GSO Funds and (ii) repay approximately $41.7 million of debt under the GSO Credit Agreement.***
>
> ***Due to the gain on sale of RNP upon completion of the Merger, we expect to utilize all of our federal NOL carryforwards, R&D credits and AMT credit carryforwards. During the three months ended September 30, 2016, we paid estimated tax payments totaling $4.4 million. We expect to make additional estimated tax payments during the three months ended December 31, 2016 totaling between $1.0 million and $2.0 million.***

37. The above statements were false and misleading because, as Defendants admitted within Rentech's Form 8-K filed on April 4, 2017, the Company's consolidated financial statements for the three and six months ended June 30, 2016 and the three and nine months ended September 30, 2016 included in the Company's Form 10-Q for the periods ended June 30, 2016 and September 30, 2016, respectively, should no longer be relied upon, as described in ¶32.

38. Defendants, moreover, knew that the above statements were false and misleading – or were deliberately reckless in not knowing – because of the

magnitude of the errors in the Company's provision for income taxes involving non-cash deferred taxes and the allocation of tax benefit and tax expense between continuing operations and discontinued operations, and because of the other reasons described in ¶33.

39. On November 10, 2016, Rentech issued an earnings release announcing the Company's financial results for the third quarter of 2016. Within the press release, Defendant Forman emphasized the completed repairs of equipment at two of the Company's operating facilities – Wawa and Atikokan – and the significant amount of production that could be expected at the Wawa facility:

> Commenting on the quarter, Keith Forman, President and CEO of Rentech, stated, "***We completed the previously announced replacements of problematic conveyors and other maintenance and repairs at our Atikokan and Wawa plants in the third quarter***. Atikokan is consistently operating at approximately 90% of capacity and we expect the plant to operate at an annualized rate of production of approximately 100,000 metric tons of pellets until such time that we have an economic justification to replace the last remaining bottleneck conveyors. ***The new conveyors at Wawa are functioning as expected, with the plant producing at an annualized rate of approximately 150,000 metric tons of pellets.*** We are working to resolve some equipment and operating issues as we execute on our plan to ramp production at Wawa until we reach full capacity (400,000 to 450,000 metric tons annually), which is expected in late 2017."
>
> Summary of Results
>
> ***During the first nine months of 2016, Rentech recorded a book gain of $358.6 million in discontinued operations on the sale of Rentech Nitrogen Partners (RNP).*** The gain is comprised primarily of $59.8 million of cash proceeds and CVR Partners (CVR) common units valued at $202.1 million, based on CVR's closing price on March 31, 2016 of $8.36 per unit, compared to the company's share of RNP's negative net book value of $97.5 million as of March 31, 2016.
>
> Outlook
>
> ***For 2016, Rentech expects Fulghum to generate EBITDA of $16 – $17 million and NEWP to generate EBITDA of $5-$6 million. NEWP's projected EBITDA is significantly lower than what the***

> ***company would expect the business to generate in an environment with more normalized weather patterns.***
>
> ***Rentech expects the Atikokan plant to operate at approximately 90% of capacity*** or at approximately 100,000 metric tons of annualized wood pellet production until such time that we have an economic justification to replace the last remaining bottleneck conveyors.
>
> ***Rentech expects the Wawa facility to reach approximately 60% of production capacity within the next couple of quarters and anticipates reaching full capacity in the range of 400,000 – 450,000 metric tons of wood pellets in late 2017. At an annual production capacity of 400,000 metric tons, we would be able to fulfill our yearly obligations under the Drax contract and generate positive cash flow at Wawa based on today's economic variables.*** However, we are currently evaluating our stabilized EBITDA forecast as Wawa continues ramping up production given that operating costs at Wawa have been higher than expected, and may continue to be so going forward, which negatively impacts profitability under the contract with Drax.

40. The Company also held a conference call with investors on November 10, 2016. Defendant Forman spoke extensively about the functionality of the new equipment and the expected growth in production at the Wawa facility, as well as the increased performance at the Atikokan facility, stating, in pertinent part, the following:

> **Keith Forman**
>
> In September, we completed the previously announced replacement of problematic conveyors and conducted other maintenance and repairs at both plants. Atikokan is now consistently averaging daily operating rates of just under 90% of capacity, following the planned seven day outage that included replacing two conveyors.
>
> ***We now consider Atikokan to be fully operational and expect it to continue to operate at approximately 90% of capacity or at approximately 100,000 metric tons of annualized production*** until such time that we have an economic justification to replace the last remaining bottleneck conveyors.
>
> * * *
>
> With respect to Wawa, we completed startup and commissioning of the new conveyors at the facility last month, following an approximately 5.5 week shutdown that also included performing maintenance and repair work. The plant is currently achieving operating rates that

annualized to approximately 150,000 metric tons of production, which is essentially the level achieved prior to the conveyor project.

***The new conveyors are functioning as expected, but we are working to resolve other equipment and operating challenges that have manifested themselves post turnaround. Throughout the ramp-up we are focused on ensuring that Wawa is able to sustain incrementally higher production rates with all of the new conveyors and equipment.***

* * *

While we expect Wawa to achieve consistent improvements in operating efficiency, we continue to be vigilant in monitoring the plant's various processes to identify any potential bottlenecks in a timely manner and address them prior to any bottleneck having a significant impact on production.

***We expect the plant to reach approximately 60% of production capacity within the next couple quarters and anticipate reaching full capacity in the range of 400,000 to 450,000 metric tons late in the year***.

* * *

I'll close out the discussion of Canada by noting that we're pleased with how well Atikokan is performing.

We have identified and deployed additional engineering, technical and operating resources for Wawa, we believe will be able to help us overcome any operating challenges and remaining bottleneck at the plant that may arise as we ramp up to full capacity.

**Jeffrey Spain**

The pretax value of our approximately 7.2 million units of CVR partners was nearly $38 million as of September 30. We estimate that remaining capital expenditures for the Canadian plant as of September 30 will be approximately $14.5 million, which includes approximately $5 million for potential additional conveyor replacements at Atikokan and other potential improvements that are on hold until such time that the investment can be justified.

* * *

**Unidentified Analyst**

I had a question about the industrial side, what is the level of production at Wawa for this – for the division to be EBITDA breakeven?

**Keith Forman**

Jeff that's a question that we can't answer. We have a whole range of estimates to pick depending on the costs. . . . .

But the thing that's really changed and made it less certain is the operating paradigm and we still have yet to operate anywhere near capacity. So we are seeing signs as we're operating more consistently that our costs as the way we operate now are not in line with being as profitable as we had hoped.

* * *

**Unidentified Analyst**

Okay. Maybe I'll it ask it a different way which is Q3 industrial segment lost money, had negative EBITDA and you will have talked about when Wawa does get to full capacity, you've talked about what the range would be in understanding that number might be influx, but it was a significantly positive number mid-teens Canadian EBITDA as my memory.

***So the picture you're painting is that plant will ramp over the next 12 months, so at some point, you cross over from losses into breakeven and then you crossover into making money***, how far away are we from that division breakeven and not being a drag on EBITDA?

**Keith Forman**

I don't have a date. I don't want to make anybody on this side of the phone call sound ignorant, but if certain factors change sooner, that date moves way towards us and if certain factors don't change, that date is out there and also provides – also introduces other issues relative to, is this sustainable goal to strive for.

* * *

We still are at Atikokan, our plant is profitable. It's actually pretty down close to where the numbers were originally set up a couple years ago. The plants lost my train of thought here, but we do have – still have access to even in this market at very favorable cost of product. So I guess what I'm indicating is that there is headroom on what the value of what we make can be sold for in the pellet world longer-term.

* * *

**Unidentified Analyst**

Okay. ***And so it would seem to me that even if the plants not operating at full capacity, you don't have any planned downtime for Q4. So unless you have significantly planned downtime, doesn't seem like you have further inventory write-downs in the future; am I understanding that correctly?***

**Keith Forman**

Until we get closer to capacity, our per ton cost would continue to be perhaps below selling price and it touches on the breakeven inflection point that you're asking about in that you reach that breakeven and you no longer experience LCM. So would expect to experience them until we get closer to that breakeven point.

> **Unidentified Analyst**
>
> Just on the Wawa plant, on the last call you said you still expect that to get much closer to its original nameplate capacity. I know you've still got a range in there, but ***has anything about these ongoing ramps there dissuaded you from the view that you can*** – you still have a great to get at or close to the original nameplate?
>
> **Keith Forman**
>
> ***No*** what's happened matters that we've operated that consistently – more consistently. I don't say consistently higher numbers, because we're back at 30%, 35%, 40% of capacity but the consistency it's basically moved the clock further down the pipe, but what we're seeing is what we used the somewhat vague term equipment and operations because ***it is a list of items that we've seen to date that don't have capital – they don't have major costs associated with them.***
>
> It's really fixing green screen aspiration on pallets, shoots, the logging feed system that's on the equipment side, on the operating side, it's using the proper fuels in the furnaces, it's making sure that certain types of feedstock come in with certain moisture levels, that maybe we're putting in two dry on the fine side and two moist on the chip side.

41. The statements referenced above were each materially false and misleading because they failed to disclose, and materially misrepresented, the following adverse facts known by Defendants during the Class Period:

(a) Defendants knew that the Wawa facility was essentially a stranded asset. Indeed, the distance from the Wawa facility to the operating port in Quebec City was approximately 684 miles. In fact, when Rentech held a conference call with analysts and investors on March 16, 2017, Defendant Forman admitted that Defendants knew about the distance between the Wawa facility to the operating port in Quebec City "when the original brownfield conversion occurred." Defendants, moreover, failed to disclose that the port for the Wawa facility was originally intended to be in Montreal, not Quebec City. The distance from the Wawa facility to Quebec City was so far that it

essentially rendered the Wawa facility a stranded asset incapable of adequately operating as Defendants represented;

(b) Defendants knew that the challenges posed by the distance between the Company's Wawa facility and the operating port in Quebec City would be compounded by the conveyance issues that the Company experienced – problems that Rentech experienced at both the Atikokan and Wawa facilities. Defendants were aware that, contrary to their representations, modification or replacement of a significant portion of Wawa's conveyance systems would not adequately address design flaws in the conveyance system at the Wawa facility, but instead would require substantial capital expenditures to bring the facility up to the capacity levels needed to fulfill its production obligations. Defendants also knew these design issues were exacerbated by the lengthy distance between the Wawa facility and the operating port in Quebec City. Defendants also knew that the problematic conveyors and other maintenance and repairs that were performed at the Atikokan and Wawa facilities would continue to cause operational problems because such repairs did not ameliorate such design flaws and other inherent conveyance issues at the Atikokan and Wawa facilities. Defendants knew, therefore, that the issues with equipment and operating challenges had not been repaired, but rather persisted throughout the Class Period;

(c) Defendants failed to disclose material details regarding the Fulghum contracts. Although Rentech listed more generic details regarding the Fulghum contracts within the Company's SEC filings – such as which facilities were leased and owned and the tenure of the contracts – Defendants failed to provide critical information regarding such contracts that would have altered the total mix of information available to analysts and investors. For example, such information included whether operating fees were embedded in the contracts, information regarding profit per ton, and information regarding the recovery of capital invested. This information regarding the Company's Fulghum contracts was material to analysts and investors, and yet Defendants failed to provide such information to enable investors to assess their investment decisions;

(d) the pretax gain resulting from the Rentech Nitrogen sale was materially overstated because the Company suffered from material weaknesses in financial reporting and did not perform certain procedures over the allocation of the GAAP tax provision between continuing and discontinued operations in the second quarter of 2016 in accordance with its designed controls; and

(e) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were false and misleading and/or lacked a reasonable basis at the time the statements were made.

42. On February 10, 2017, Rentech filed a Form 8-K announcing that on February 6, 2017, John A. Williams ("Williams") had submitted his resignation effective immediately as a member of the Company's Board of Directors, including as a member of Rentech's Audit Committee and a member of the Nominating and Corporate Governance Committee. Williams had served as a director of the Company since November 2009.

**THE TRUTH BEGINS TO EMERGE**

43. On February 21, 2017, prior to the market opening, Rentech issued a statement announcing the cessation of production at the Company's Wawa facility and the reduction of operations and production at the Atikokan facility. The press release stated the following:

> ***Rentech, Inc. (NASDAQ: RTK) announced today that its board has decided to idle the Wawa facility due to equipment and operational issues that would require additional unbudgeted capital investment. Today's decision also results from continued uncertainty around profitability on pellets produced at the facility***, making additional investment in the facility uneconomic for Rentech at this time. Idling the plant will allow Rentech to conserve liquidity as it formally explores strategic alternatives for the plant including ongoing discussions with third parties. In conjunction with the strategic review of the Wawa facility, ***Rentech is also exploring strategic alternatives for the Company as a whole***.
>
> * * *
>
> **Wawa Facility**
>
> As noted in prior communications, ***the Wawa facility experienced equipment and operating challenges subsequent to the replacement of problematic conveyors last fall. These issues have persisted***.
>
> On February 16, 2017, our board made the decision to suspend operations at the facility. This decision is based in part on our review of the work by a third-party engineering firm to identify necessary capital improvements. While we believe that the issues we have been experiencing at the facility can be resolved with additional capital

investments, ***we have concluded that it is not economical to pursue those investments or to continue to operate the facility at this time.*** Rentech's other businesses, including its Atikokan facility, continue to operate without interruption.

* * *

***Rentech expects to incur a significant asset impairment charge relating to the Wawa and Atikokan facilities in its fourth quarter 2016 results***.

**Updates on Other Businesses**

***Atikokan Facility***

We are reducing production at the Atikokan facility to levels necessary to fulfill the delivery requirements under the Ontario Power Generation off-take contract. We expect the Atikokan facility to generate cash flow in the range of break-even to slightly positive in 2017 under this revised operating plan. ***Atikokan will no longer ship pellets to the Port of Quebec.*** We will continue to explore alternatives for selling additional pellets produced from the Atikokan facility to increase its utilization.

***Fulghum Fibres***

***A customer of Fulghum Fibres (Fulghum) has indicated its intent to exercise its option to purchase two wood chipping mills that Fulghum is operating for the customer under a processing agreement. The Company expects the loss of the contract to negatively impact Fulghum's cash flow in the second half of 2017 and going forward. If the purchase option is indeed exercised, the Company expects to receive a one-time cash payment of approximately $5.5 million.***

**Strategic Alternatives Review Process**

Rentech intends to explore strategic alternatives for the Wawa facility and for the Company as a whole. In conjunction with this process and to address potential future liquidity needs, Rentech is considering strategic alternatives that may include, but are not limited to, a sale of the Company, a merger or other business combination, a sale of all or a material portion of the Company's assets or a recapitalization.

***Rentech has retained Wells Fargo Securities, LLC to assist in the strategic alternatives review process***. . . . .

44. Upon the release of this news, the price of Rentech common stock plunged $1.31 per share, or 47.6%, as compared to market close on February 17, 2017, on unusually high trading volume of more than 3 million shares trading –

nearly 10 times the average daily trading volume. By February 28, 2017, the Company's common stock had plummeted more than 72% in six days.

45. On March 16, 2017, Rentech announced the Company's preliminary, selected, unaudited financial and operating results for the fourth quarter and full year ended December 31, 2016. Among other things, the Company stated the following:

> Summary of Selected Results
>
> ***Rentech expects impairments, which are non-cash items, related to its Canadian pellet plants of $110 to $120 million***.
>
> * * *
>
> Liquidity
>
> At this time, we believe we have sufficient liquidity from cash on hand and expected working capital to fund operations and corporate activities through calendar year 2017, but we may have costs associated with idling the Wawa facility and other events could arise that could increase our liquidity needs in 2017. ***We may also need additional liquidity to fund corporate activities through the first quarter of 2018. As a result, management expects to report in the Form 10-K substantial doubt about our ability to continue as a going concern over the next twelve months through March 2018***, and we expect the report of the Independent Registered Public Accounting Firm for our consolidated financial statements for the fiscal year ended December 31, 2016 to disclose the same.

46. Also on March 16, 2017, Rentech held a conference call with analysts and investors to discuss the Company's financial results for the fourth quarter and full year of 2016. During the conference call, Defendants represented the following:

> **Keith B. Forman**
>
> I'll first start by addressing the press release we issued a few weeks ago on February 21. We announced then that our Board had decided to idle the Wawa facility due to equipment and operational issues that require additional unbudgeted capital expenditures. In addition, there remains uncertainty around profitability of pellets produced at the facility. We believe that the issues we had been experienced at Wawa can be

resolved with additional capital investments, ***but we do not believe it is economical for us to make those investments*** or for us to continue to operate the plant at this time.

* * *

***In our February press release, we announced that a customer of Fulghum indicated its intent[] to exercise its option to purchase two wood [c]hipping mills that Fulghum operates for the customer. If the purchase option is exercised, we expect to receive a one-time cash payment of approximately $5.5 million. We expect the loss of these mills to negatively impact operating income and cash flow in the second half of 2017 and going forward. These mills contributed approximately $4 million of EBITDA in 2016.***

***Fulghum incurred capital expenditures of about $0.5 million for these two mills in 2016. In spite [of] two customers exercising their right to purchase mills within the past year, we do not believe this is a trend. Fulghum's remaining 24 U.S. mills service a diversified customer base, the majority of whom are large pulp, paper and packaging manufacturers. Fulghum continues to explore opportunities with current and new customers to generate additional cash flow to compensate for its lost EBITDA.***

* * *

**Paul Summers**

As you know***, we are delayed in filing our Form 10-K due to our review of accounting impairments and our book tax provision. We expect impairments, which are non-cash items relating to the Canadian pellet plants, of approximately $110 million to $120 million. We are still assessing impairments related to Fulghum. I will note that Fulghum has approximately $30 million of goodwill, which may be substantially impaired. In addition, we expect an asset impairment relating to two mills for which a customer recently indicated its intent to exercise its purchase option.*** We expect to file our Form 10-K with complete financial results, once we complete our analysis and review of the impairments and the tax provision.

* * *

**Joseph Pratt**

***Hi. A couple of questions. One of the disturbing things is the selling off for $5.5 million, $3.5 million in EBITDA. Are the Fulghum contracts disclosed in any SEC filing? I'm just concerned that there's more of that diminution on the horizon.***

**Keith B. Forman**

Yeah. The contracts are listed there, Joe. I don't think we say – I think we say which facilities are leased, which are owned. We give the tenure, but we'd certainly caution that ***all of the contracts have provisions that provide for early termination.*** The contracts have embedded in them – historically, the contracts have embedded in them

> an operating fee, a profit per ton, ***but also recovery of capital invested. And the capital invested was typically or predominantly debt***.
>
> And this plant, going back in history prior to Rentech owning it, was a levered facility with CIT, had a loan that constructed the plant. That loan was retired prior to maturity. But the amortization component of that loan stayed intact in the contract, as if it was still alive. At some point, when that loan was repaid in reality or theory, then the rate would have dropped to eliminate that recovery of capital.
>
> ***So, the $5.5 million is essentially a back-end payment of that perceived amortization.*** So it's really – we don't get into that level of detail on every one of our contracts. . . .
>
> * * *
>
> **Joseph Pratt**
>
> ***Well, I talked to one guy around pulp plants and he just said the 1,100 kilometers was very, very long. And he wondered if that made Wawa a stranded asset. And, therefore, Wawa's only value was liquidating the equipment, which might have cost $25 million at fire sale prices.***
>
> **Keith B. Forman**
>
> Well, Joe, I'm not going to speculate on that. ***But the 1,100 kilometers was always a known. It was known when the original brownfield conversion occurred and I just don't want to go through the list of sort of foul balls that were hit here.*** But the attraction was a pre-existing warehouse or OSB plant that could be gotten on the cheap with great rail connectivity. And that's where the whole thing started. ***The port was originally supposed to be in Montreal, which was the basis of the original contract. But then, it was moved further away from the plant to Quebec City to allow for larger draft vessels pursuant to the Drax request with no modification in the revenue component of the contract.***

47. Upon the release of this news, the price of Rentech common stock fell to $0.59 per share on unusually high trading volume.

48. On April 4, 2017, Rentech filed a Form 8-K regarding non-reliance on previously-issued financial statements. Specifically, the Company announced the following:

> On March 29, 2017, the Audit Committee of the Board of Directors of Rentech concluded that the Company's consolidated financial statements for the three and six months ended June 30, 2016 and the three and nine months ended September 30, 2016 included in the

Company's Form 10-Q for the periods ended June 30, 2016 and September 30, 2016, respectively, ***should no longer be relied upon*** for the reasons described below.

The Company plans to include financial information detailing the restatement for the interim three and six month periods ended June 30, 2016 and the three and nine month periods ended September 30, 2016 in its annual report on Form 10-K for the year ended December 31, 2016. ***The Company is restating these financial statements to correct errors in its provision for income taxes involving non-cash deferred taxes and the allocation of tax benefit and tax expense between continuing operations and discontinued operations***.

On April 1, 2016, Rentech completed the merger of Rentech Nitrogen Partners, L.P. ("RNP") into CVR Partners, L.P. ("CVR"). Pursuant to the merger agreement, each outstanding unit of RNP was exchanged for 1.04 common units of CVR ("CVR Common Units") and $2.57 of cash. The Company received merger consideration of $59.8 million of cash and 24.2 million CVR Common Units. The Company used 17.0 million CVR Common Units received in the merger and $10.0 million of cash to: (i) repurchase and retire all $100 million of the Company's Series E Convertible Preferred Stock held by certain funds managed by or affiliated with GSO Capital Partners LP (the "GSO Funds") and (ii) repay approximately $41.7 million of debt under the Company's credit agreement with the GSO Funds. Following the merger and related transactions, the Company owns approximately 7.2 million CVR Common Units.

The Company recorded adjustments to deferred tax assets and liabilities related to the merger during the three months ended June 30, 2016. Based upon further review of the accounting for the transaction in connection with the preparation of its financial statements for the year ended December 31, 2016, ***the Company determined that a book and tax basis difference existed of approximately $60 million related to the investment in CVR immediately following the transaction. The Company has therefore concluded that it should have recorded a non-cash deferred tax liability, which would have resulted in approximately $21.3 million of additional income tax expense in the quarter and six months ended June 30, 2016 and approximately $19.9 million of additional tax expense for the nine months ended September 30, 2016*** (due to a reduction of approximately $1.4 million in income tax expense for the three months ended September 30, 2016).

***The Company has also determined that the allocation of tax benefit and expense between continuing operations and discontinued operations for the affected periods should be amended due to the release of a valuation allowance that was improperly classified***. The change in allocation of this item does not impact consolidated net income. ***The Company expects income tax benefit from continuing operations and income tax expense from discontinued operations to be reduced by approximately $100 million and $80 million***, respectively, for the three and six months ended June 30, 2016, as well as the nine months ended September 30, 2016 ***due to the classification error of the valuation allowance release and the need to record the***

> ***deferred tax liability for the CVR Common Units received in the merger transaction***.

49. On April 6, 2017, Rentech filed its Form 10-K for the fiscal year ended December 31, 2016. Within the Form 10-K, the Company stated the following:

> **ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**
>
> **RESTATEMENT**
>
> In this report, the Company has restated its financial statements for the three and six months ended June 30, 2016, and the three months and nine months ended September 30, 2016. These restatements and the material weakness reported herein are due to an incorrect calculation of the Company's income tax provisions and affected non-cash deferred taxes and the allocation of tax benefit and tax expense between continuing operations and discontinued operations. For further information regarding the impact of the restatement to the balance sheets, statements of operations and net income (loss) per common share attributable to Rentech, see Note 24 to our consolidated financial statements included in this report.
>
> **OVERVIEW OF OUR BUSINESS**
>
> In February 2017, we announced that we have (i) decided to idle our Wawa Facility and (ii) reduced production at our Atikokan Facility to levels necessary to only fulfill the delivery requirements under the OPG Contract with OPG. These decisions result from many factors, including without limitation, continued difficulty with ramping up production and additional capital required to increase production to levels near the facilities design capacity, projected operating costs which exceed our original expectations and uncertainty around future profitability. ***Due to the challenges, we recorded net asset impairment charges for the Wawa Facility and the Atikokan Facility totaling $116.2 million for the year ended December 31, 2016***.
>
> **ITEM 9A. CONTROLS AND PROCEDURES**
>
> **Evaluation of Disclosure Controls and Procedures**
>
> As we previously reported in 2015 and 2016, management identified material weaknesses in internal control over financial reporting, or ICFR, as described below. See "Part II—Item 9A. Controls and Procedures—Management's Annual Report on Internal Control Over Financial Reporting" in our Annual Report on Form 10-K filed on March 15, 2016, and "Part I—Item 4. Controls and Procedures" in our Quarterly Reports on Form 10-Q filed on August 15, 2016 and November 9, 2016. ***Based on their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our DCP was not effective at the reasonable assurance level as of December 31, 2016***.

**Management's Annual Report on Internal Control Over Financial Reporting**

As we previously reported, we identified the following material weaknesses which continue to exist as of December 31, 2016. A material weakness is a deficiency, or combination of deficiencies, in ICFR, such that there is a reasonable possibility that a material misstatement of the annual or interim financial statements will not be prevented or detected on a timely basis.

* * *

This control deficiency, if unremediated, could result in a material misstatement to the annual or interim consolidated financial statements that would not be prevented or detected by the controls. Accordingly, our management has determined that this control deficiency constitutes a material weakness.

Additionally, as we previously reported in 2016, there was a deficiency in effective internal controls over the allocation of GAAP income tax expense between continuing and discontinued operations. ***Specifically, we did not perform certain procedures over the allocation of the GAAP tax provision between continuing and discontinued operations in the second quarter of 2016 in accordance with our designed controls***. In our Quarterly Report on Form 10-Q for the six months ended June 30, 2016, this control deficiency resulted in a material adjustment prior to finalizing our presentation of GAAP income tax expense between continuing and discontinued operations in our recasted 2015 consolidated financial statements for the three-month and six-month periods ended June 30, 2015.

In preparing our year-end financial statements for 2016, we identified that the control deficiency related to income taxes, as described above, also affected our financial results for the three and six months ended June 30, 2016 and the three and nine months ended September 30, 2016. ***As a result, we determined that the allocation of tax benefit and expense between continuing operations and discontinued operations for the affected periods should be revised. We determined that the income tax benefit from continuing operations and income tax expense from discontinued operations should be reduced by approximately $100 million and $80 million***, respectively, for the three and six months ended June 30, 2016, as well as the nine months ended September 30, 2016. In addition, ***we concluded that we should have recorded a non-cash deferred tax liability, which would have resulted in approximately $20 million of additional income tax expense in the quarter ended June 30, 2016. The control deficiency resulted in a restatement of our financial statements*** for the three and six months ended June 30, 2016 and the three and nine months ended September 30, 2016, as set forth in Note 24 of our Consolidated Financial Statements in "Part II — Item 8. Financial Statements and Supplementary Data." in this report.

***This control deficiency resulted in a material misstatement to the interim consolidated financial statements. Accordingly, our***

***management has determined that this control deficiency constitutes a material weakness***.

**RESTATEMENT**

In this report, the Company has restated its consolidated financial statements for the three and six months ended June 30, 2016, and the three months and nine months ended September 30, 2016. These restatements and the material weakness reported herein are due to an incorrect calculation of the Company's income tax provisions and affected non-cash deferred taxes and the allocation of tax benefit and tax expense between continuing operations and discontinued operations.

The Company recorded adjustments to deferred tax assets and liabilities related to the merger of RNP and Rentech Nitrogen GP, LLC with affiliates of CVR Partners, L.P., or CVR, (as discussed in Note 7 to our consolidated financial statements included in this report) during the three months ended June 30, 2016. Based upon further review of the accounting for the transaction in connection with the preparation of its financial statements for the year ended December 31, 2016, the Company determined that a book and tax basis difference existed of approximately $60 million related to the investment in CVR immediately following the transaction. ***The Company has therefore concluded that it should have recorded a non-cash deferred tax liability, which would have resulted in approximately $21.3 million of additional income tax expense in the three and six months ended June 30, 2016 and approximately $19.9 million of additional income tax expense for the nine months ended September 30, 2016*** (due to a reduction of approximately $1.4 million in income tax expense for the three months ended September 30, 2016).

***The Company has also determined that the allocation of tax benefit and expense between continuing operations and discontinued operations for the affected periods should be amended due to the release of a valuation allowance that was improperly classified***. The change in allocation of this item does not impact consolidated net income. ***The income tax benefit from continuing operations and income tax expense from discontinued operations should be reduced by approximately $100 million and $80 million***, respectively, for the three and six months ended June 30, 2016, as well as the nine months ended September 30, 2016 ***due to the classification error of the valuation allowance release and need to record the deferred tax liability for the CVR units received in the Merger. As a result, income from continuing operations was overstated, income from discontinued operations, net of tax was understated, net income was overstated***, except for the three months ended September 30, 2016 when it was understated, and deferred income taxes (liabilities) was understated.

The Company has not amended its Quarterly Reports on Form 10-Q for prior periods affected by the restatement adjustments. Accordingly the financial statements and related financial information contained in such reports should no longer be relied upon. For further information regarding the impact of the restatement to the balance sheets,

> statements of operations and net income (loss) per common share attributable to Rentech, see Note 24 to our consolidated financial statements included in this report.
>
> ***Overview of our Results of Operations***
>
> [W]e have had inventory write-downs of $24.8 million during 2016 primarily as a result of a high level of fixed operating costs allocated to relatively low volumes produced at the Atikokan and Wawa Facilities during this period of ramp-up at both facilities.
>
> ***Restatement***
>
> ***In filings that covered reporting periods for the three and six months ended June 30, 2016, and the three and nine months ended September 30, 2016, the Company incorrectly calculated its income tax provisions***. The errors involved non-cash deferred taxes and the allocation of tax benefit and tax expense between continuing operations and discontinued operations.
>
> * * *
>
> ***As a result, income from continuing operations was overstated, income from discontinued operations, net of tax was understated, net income was overstated, except for the three months ended September 30, 2016 when it was understated, and deferred income taxes (liabilities) was understated***. The Company concluded that its consolidated financial statements for the three and six months ended June 30, 2016 and the three and nine months ended September 30, 2016 included in the Company's Form 10-Q for the periods ended June 30, 2016 and September 30, 2016, respectively, should no longer be relied upon for the reasons described above. Therefore, it has restated its financial statements for the three and six months ended June 30, 2016, and the three and nine months ended September 30, 2016. See below for the impact of the restatement to the balance sheets, statements of operations and net income (loss) per common share attributable to Rentech.

50. A June 22, 2017 article entitled "Rentech (RTK) Kryptonite Slams Investors" noted the following:

> CEO Keith Forman has managed to cut costs since coming on board in December 2014. But the company clearly continues to wade through ***production issue after production issue, especially with the key plant, Wawa***.
>
> "Even with these recent challenges," Mr. Forman said during the first earnings call in May, "we are still learning how to respond to or prevent these causes of production disruption that are typical, a ramp up of new pellet nodes such as sparks, jams, plugging, dust, moisture, content, silica content, truck dump outages, hammer mill clogging, et cetera, et cetera, et cetera."

> ***Listening to the second quarter conference call on Aug. 10, investors may have felt issues were improving as management described "replacing the remaining problematic conveyors," and developing methods "to get our hands around problems as to when something is amiss when an alarm goes off or a signal comes to the control room it says hey this is not functioning properly."***
>
> ***But the Ontario, Canada Wawa plant is still only "producing at approximately 40% of capacity during the past several weeks."***
>
> Both Wawa and the Atikokan plants were fiber processing mills that the company is converting into wood pellet plants. Yet after three years . . . Wawa is still producing well below capacity at 40%, while Mr. Forman expects somewhere "north of 70%" or more before the plant might become EBITDA positive.
>
> ***And filings say they're not even sure what capacity is:***
>
> ***"In light of the production challenges the Company has experienced at the Wawa Facility, it is evaluating the production capacity of the plant***. The Company is investigating whether there are potential design shortcomings similar to those that surfaced with the plant's conveyance systems that might limit capacity. The Company is ***also evaluating uptime and operating efficiency rates achievable for full capacity***."

**CLASS ACTION ALLEGATIONS**

51. Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased the Company's common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have, or had, a controlling interest.

52. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's common stock was actively traded on NASDAQ. While the exact number of Class members is

unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

53. Plaintiff's claims are typical of the claims of the members of the Class, since all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law alleged herein.

54. Plaintiff will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in class action and securities litigation.

55. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts constituted violations of the federal securities laws;

(b) whether Defendants' statements made to the investing public during the Class Period misrepresented material facts concerning the Company's business, operations, and financial condition;

(c) whether the price of the Company's common stock was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

56. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. Additionally, there will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

57. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's common stock. Defendants' conduct, moreover, operated as a fraud or deceit on Class Period purchasers of the Company's common stock by failing to disclose, and misrepresenting, the adverse facts detailed herein. As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of the Company's common stock declined significantly as the prior artificial inflation dissipated from the Company's stock price.

58. As a result of the purchases of the Company's common stock during the Class Period, Plaintiff and the other members of the Class suffered economic loss (damages) under the federal securities laws. Defendants' false and misleading statements had the intended effect, and caused, the Company's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $3.91 per share on August 17, 2016.

59. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects. As the truth regarding the Company was revealed to the market, the price of the Company's common stock fell significantly. These declines removed the inflation from the price of the Company's common stock, causing real economic loss to investors who purchased the Company's common stock during the Class Period.

60. The declines in the price of the Company's common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in the Company's common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to defendants' fraudulent conduct.

61. During the Class Period, the Company's stock price declined from $2.63 per share on the first day of the Class Period to $0.47 per share on the last day of the Class Period, as the Company's true financial condition was revealed to the investing public.

62. Specifically, on August 10, 2016, Rentech issued a press release announcing the Company's results for the second quarter of 2016. Rentech announced second quarter earnings per share of $12.95 and revenue of $31.8 million versus $39.9 million in the prior year period. Defendants also announced that the Company was preparing to shut down its Wawa facility in the following days to replace remaining problematic conveyors and to complete mechanical upgrades. Rentech announced further that once the Company's Wawa facility was once again operational, Defendants expected the Wawa facility to ramp up from approximately 40% capacity to approximately 70% capacity over the next several quarters. These announcements sent Rentech shares soaring more than 20% in a day and over 50% in seven trading days.

63. On February 21, 2017, prior to the market opening, Rentech issued a statement announcing the cessation of production at the Company's Wawa facility and the reduction of operations and production at the Atikokan facility. Upon the release of this news, the price of Rentech common stock plunged $1.31 per share, or 47.6%, as compared to market close on February 17, 2017, on unusually high trading volume of more than 3 million shares trading – nearly ten times the average

daily trading volume. By February 28, 2017, the Company's common stock had plummeted more than 72% in six days.

64. On March 16, 2017, Rentech announced the Company's preliminary, selected, unaudited financial and operating results for the fourth quarter and full year ended December 31, 2016. On that date, Rentech reported, among other things, impairments related to its Canadian pellet plants of $110 to $120 million. Upon the release of this news, the price of Rentech common stock fell to $0.59 per share on unusually high trading volume.

65. The economic loss (damages) suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's common stock and the subsequent significant decline in the value of the Company's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

66. At all relevant times, the market for the Company's common stock was an efficient market for the following reasons, among others:

(a) The Company's common stock met the requirements for listing, and was listed and actively traded on, NASDAQ, a highly efficient, electronic stock market;

(b) The Company had more than 23.19 million shares outstanding as of November 9, 2016. During the Class Period, on average, 305,001 shares of Rentech

stock were traded on a daily basis, demonstrating a very active and broad market for Rentech stock, and permitting a very strong presumption of an efficient market;

(c) As a regulated issuer, the Company filed periodic public reports with the SEC;

(d) The Company regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e) The Company was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

67. As a result of the foregoing, the market for the Company's common stock promptly digested current information concerning the Company from all publicly available sources and reflected such information in the prices of the Company's stock. Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

**NO SAFE HARBOR**

68. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein. Many of the specific statements alleged herein were not identified as "forward-looking statements" when made, and thus are not entitled to protection under the safe harbor provision. Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

**COUNT I**
**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants**

69. Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

70. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or

were deliberately reckless in not knowing, were misleading. These statements were false and misleading because they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

71. Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact/and or omitted to state material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

72. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid – or at all – if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

73. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

74. Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

75. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

76. The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein. The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected. Additionally, the Individual Defendants had direct and supervisory

involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

77. The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

78. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: July 10, 2017

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Ex Kano S. Sams II*
LIONEL Z. GLANCY
ROBERT V. PRONGAY
EX KANO S. SAMS II
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: esams@glancylaw.com

**HOLZER & HOLZER, LLC**
COREY D. HOLZER
MARSHALL P. DEES
ALEXANDRIA P. RANKIN
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029

*Lead Counsel for Lead Plaintiff*

**PROOF OF SERVICE BY ELECTRONIC POSTING**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old. On July 10, 2017, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Central District of California, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 10, 2017, at Los Angeles, California.

*s/ Ex Kano S. Sams II*
Ex Kano S. Sams II

# Mailing Information for a Case 2:17-cv-01490-GW-FFM Cheng Jiangchen v. Rentech, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Lionel Zevi Glancy**
  lglancy@glancylaw.com
- **Corey D Holzer**
  cholzer@holzerlaw.com
- **Charles Henry Linehan**
  clinehan@glancylaw.com
- **Lesley F Portnoy**
  LPortnoy@glancylaw.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,CLinehan@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com
- **Ex Kano S Sams , II**
  esams@glancylaw.com,info@glancylaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)