**GLANCY PRONGAY & MURRAY LLP**
LIONEL Z. GLANCY (#134180)
ROBERT V. PRONGAY (#270796)
EX KANO S. SAMS II (#192936)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: esams@glancylaw.com

**HOLZER & HOLZER, LLC**
COREY D. HOLZER
MARSHALL P. DEES
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029

*Lead Counsel for Lead Plaintiff*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CHENG JIANGCHEN, Individually and on Behalf of All Others Similarly Situated,<br>Plaintiff,<br>vs.<br>RENTECH, INC., KEITH B. FORMAN, and JEFFREY SPAIN,<br>Defendants. | Case No. 2:17-cv-01490-GW-FFM<br>**FOURTH AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br>**<u>DEMAND FOR JURY TRIAL</u>** |

Lead Plaintiff Ichiro Ikuno ("Plaintiff") alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of United States Securities and Exchange Commission ("SEC") filings by Rentech, Inc. ("Rentech" or the "Company"), as well as securities analysts' reports and advisories about the Company, press releases, media reports, accounts of former Rentech employees, and other public statements issued by, or about, the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all persons and/or entities who purchased or otherwise acquired the Company's common stock between March 15, 2016 and April 6, 2017, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

## INTRODUCTION

2. At the start of 2016, Rentech was a highly-leveraged company attempting to convert brownfields (abandoned or underutilized commercial properties) into wood-pellet processing plants in Canada. Retench's ultimate success in its plan to transition into a pure wood-fibre business depended upon its ability to bring the Canadian facilities online in an economically-feasible manner. The conversion – particularly at the Company's facility in Wawa, Ontario – consistently required new and costly repairs, and redesigns that delayed Rentech's ability to fulfill its contractual obligations to supply wood pellets to its customers.

3. Rentech's inability to generate revenue with functioning plants – combined with the high cost of ongoing repairs at its Canadian wood-pellet facilities – threatened Rentech's ability to service its debts, including significant obligations

under loan documents that the Company entered in connection with the divestiture of its interest in a nitrogen fertilizer business, Rentech Nitrogen Partners ("RNP").

4. On March 11, 2016, Rentech executed a First Amendment to Loan Documents (the "First A&R GSO Credit Agreement"), among: RNP, as borrower; Rentech, as parent guarantor; certain funds (the "GSO Funds") managed by or affiliated with GSO Capital Partners LP ("GSO Capital"), as lenders (the "Lenders"); and Credit Suisse AG, Cayman Islands Branch, as administrative agent (the "Agent"). On April 1, 2016, Rentech executed a Second Amendment to Loan Documents ("Second A&R GSO Credit Agreement").

5. Default on the GSO loans would result in liquidation of Rentech, as the GSO loans were secured by a lien on substantially all of Rentech's tangible and intangible property, and by a pledge of all of its ownership interests in any entity for which Rentech controlled more than a 50% interest.

6. Rentech attempted to reduce its debt load and access additional funding through the monetization of its interest in RNP, of which Rentech was general partner. Rentech agreed to merge RNP with CVR Partners. Under the terms of the transaction, each eligible RNP common unit issued and outstanding immediately prior to the closing was to be automatically converted into the right to receive 1.04 units of CVR Partners and $2.57 of cash. Rentech owned nearly 60% of the outstanding RNP common units at the time.

7. In the process of closing the divestiture in April 2016, Rentech amended its loan agreement with the GSO Funds to transfer a portion of its CVR Partners common units to the GSO Funds to satisfy a portion of Rentech's loan obligations. The amended agreement also provided Rentech access to a new $6 million line of credit.

8. However, Defendants Keith B. Forman ("Forman"), Rentech's former Chief Executive Officer ("CEO"), and Jeffrey Spain ("Spain"), Rentech's former

Chief Financial Officer ("CFO"), were aware that during 2015 and 2016, Rentech experienced revenue, cash flow, and liquidity challenges so severe that they threatened Rentech's ability to continue to service its debts.

9. Indeed, on April 16, 2016, Defendants secretly engaged Wells Fargo to review strategic alternatives to help Rentech service its still-massive debt load, which was made more difficult by ongoing problems bringing the Wawa plant to the capacity needed for Rentech to fulfill its contractual obligations. Instead of disclosing these facts, Defendants Forman and Spain conveyed a public story of progress toward a defined level of success at the Canadian facilities, coupled with a claim that Rentech had an ability to identify and remedy the problems that remained.

10. When faced with indications that Rentech suffered from a material weakness in financial reporting in August 2016, Defendants Forman and Spain filed unaudited financial results with the SEC that showed an $80 million profit from Rentech's continuing operations (instead of $20 million loss), and a tax expense of approximately half of what the Company would actual owe when the results were audited at the end of the year.

11. Defendants Forman and Spain used the time bought by this false narrative to engage in a search for a white knight to save Rentech. Defendants had until February 2017 to find a new way forward, or they would be forced – by both the federal securities laws and the GSO lending agreements – to file audited financial results and admit Rentech did not have the money to continue its operations. When Defendants found no additional funding, Rentech publicly commenced its road to bankruptcy.

12. On February 21, 2017, Defendants announced that Rentech was idling the Wawa facility because the Company did not have the money to complete the repairs, and revealed – for the first time – that Wells Fargo was assisting with an attempt to sell the Company or its assets.

13. On March 16, 2017, Defendants announced that Rentech would not file its 2016 annual report on time, in part because the Company needed to complete its review of its accounting practices.

14. On April 4, 2017, Defendants announced that Rentech would be restating results for the second and third quarters of 2016 because the Company failed on two previous attempts to properly allocate between continuing and discontinued operations in connection with the RNP divestiture. As a result, Defendants overstated income from continuing operations by $100 million and understated tax expenses by more than $20 million.

15. On April 6, 2017, Rentech restated its prior results and revealed that the restatement was necessary because the prior results suffered from the same material deficiency allocating between continuing and discontinued operations first disclosed on August 15, 2016.

16. On December 17, 2017, Rentech filed for Chapter 11 bankruptcy and commenced liquidation proceedings.

17. In the end, Defendants were able to buy time to seek a strategic alternative throughout 2016 but, when the efforts failed and the money ran out in February 2017, they were forced to liquidate the Company at a complete loss for its remaining shareholders.

18. Plaintiff seeks recovery on behalf of investors who purchased shares during the time Defendants Forman and Spain made material misrepresentations and omissions from Rentech's public statements that undermined their claims of operational and financial improvements following the divestiture of RNP.

## JURISDICTION AND VENUE

19. The claims asserted herein arise under, and pursuant to, Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act.

21. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred, in substantial part, in this District.

22. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of an electronic securities exchange located in this District.

**PARTIES**

23. As set forth in the previously-filed certification incorporated by reference herein, Plaintiff purchased the Company's common stock during the Class Period and has been damaged thereby.

24. Non-party Rentech is a California corporation with its principal executive offices located in Los Angeles, California. As of December 19, 2017, Rentech had approximately 13 full-time employees. As of December 31, 2016, Rentech had 606 non-unionized and salaried employees, and 19 unionized employees. Rentech is a renewable energy company that specializes in the processing and manufacturing of wood fibre and nitrogen fertilizer. Rentech is not named as a defendant herein because on December 19, 2017, the United States Bankruptcy Court for the District of Delaware entered an Order for Relief under Chapter 11 of Title 11 of the United States Code in the following cases: Rentech, Inc., Case No. 17-12959 (CSS), and Rentech WP U.S., Inc., Case No. 17-12958 (CSS), and, as a result, an automatic stay applies to Rentech as a result of the bankruptcy. Plaintiff expressly reserves the right to continue to pursue the remedies

sought herein against Rentech once the automatic bankruptcy stay is no longer in effect.

25. Defendant Forman is, and was at all relevant times, President and CEO of Rentech and a member of its Board of Directors.

26. Defendant Spain was the CFO of Rentech from December 2015 to November 2016. Defendant Spain served as Rentech's Senior Vice President of Finance, Accounting and Administration for Rentech's wood fibre group immediately prior to his appointment as CFO. Defendant Spain also held various senior financial and accounting roles at Rentech, and his senior accounting and finance executive experience spans nearly 20 years. Defendant Spain received his Masters of Business Administration from the Anderson Graduate School of Management at The University of California Los Angeles and earned a Bachelor's degree in Finance from Southern Methodist University.

27. Defendants Forman and Spain are collectively referred to herein as "Defendants" or the "Individual Defendants."

28. During the Class Period, the Individual Defendants, as senior executive officers and/or directors of the Company, were privy to confidential and proprietary information concerning the Company, its operations, finances, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning the Company. Because of their possession of such information, the Individual Defendants knew, or were deliberately reckless in not knowing, that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public. Accordingly, the Individual Defendants are liable as direct participants in the wrongs alleged herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and

influence to cause the Company to engage in the unlawful conduct alleged. Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

## BACKGROUND ALLEGATIONS

29. Rentech was a wood-fibre processing company with three core businesses: (1) contract wood-handling and chipping services; (2) the manufacture and sale of wood pellets for the heating market in the United States; and (3) the manufacture, aggregation, and sale of wood pellets for the utility and industrial power generation market.

30. Before August 2015, Rentech also engaged in the sale of fertilizer through its 59.7% ownership of RNP, a publicly-traded master limited partnership that owned two fertilizer manufacturing facilities. Rentech was the General Partner, and Defendant Forman also served as CEO of RNP and was a member of its board of directors.

31. On August 9, 2015, RNP entered into an agreement and plan of merger to combine RNP with affiliates of CVR Partners, L.P. ("CVR Partners"). RNP, upon closing of the merger, would cease to be a publicly-traded company and would become a wholly-owned subsidiary of CVR Partners. Rentech expected to exchange each outstanding unit of RNP it owned for 1.04 common units of CVR Partners and $2.57 cash. Upon completion of Rentech's merger with CVR Partners, Rentech planned to be a pure-play, wood-fibre processing company. As a result of its fertilizer divesture, Rentech would be a much smaller company with a less-leveraged capital structure and lower cash-interest expense.

32. Rentech's wood-fibre processing business consisted of wood chipping services to the pulp, paper, and packaging industry, and production of wood pellets for the utility and industrial power generation market and the residential- and commercial-heating markets.

33. Rentech operated its wood-chipping business through Fulghum. Fulghum generated revenue primarily from fees under exclusive processing agreements.

34. Rentech separately produced industrial wood pellets that were used in larger scale power generation facilities. Before the start of the Class Period, Rentech began converting two brownfield areas in Ontario, Canadian into wood pellet facilities – one in Atikokan and the other in Wawa. When fully operational, Defendants told investors that Rentech's facility in Atikokan was expected to produce up to 110,000 metric tons of wood pellets annually, while the facility in Wawa was expected to produce up to 450,000 metric tons annually. During the ramp-up of both facilities, Rentech discovered the need to modify certain systems.

35. Rentech completed repairs to the Atikokan facility's faulty conveyor system at the end of 2015, and indicated in public filings that the remaining problems were expected to be repaired by mid-2016. Rentech's Wawa facility required modifications to the front-end system of the facility that handled logs and fed them into the chipping process, as well as modification or replacement of a significant portion of the plant's conveyance systems. The modifications of the front-end system and the first phase of modifications of the plant's conveyance systems were completed in late 2015. The remaining work to the conveyor systems was scheduled to be completed by mid-2016. Despite these issues, Defendants told investors that when Rentech applied a range of assumed operating efficiencies typical for the industry, the Wawa plant's annual production capacity was between 400,000 and 450,000 metric tons.

36. In 2013, Rentech entered into a 10-year take-or-pay contract to provide Drax Power Limited ("Drax") with 72,000 metric tons of wood pellets annually. According to Defendants, the low end of the planned capacity range would still allow Rentech to fulfill its annual contractual obligations and generate positive cash

flow from the Wawa plant. In August 2015, Rentech amended the contract to cancel all 2015 wood pellet deliveries due to problems at the Company's wood pellet facilities. Rentech incurred a penalty of $2.6 million associated with costs for Drax to purchase replacement pellets and to cancel shipping commitments. The Company also agreed to provide Drax with 72,000 metric tons of wood pellets in 2018 and 2019 at 2015 rates, which Defendants expected to be lower than the pricing in those future years under the original contract terms.

37. In January 2016, Rentech shipped 28,000 metric tons of wood pellets from the Port of Quebec to Drax, and in March 2016, Rentech shipped 20,000 metric tons from the same port, which was smaller than its obligation to Drax going forward. While these initial shipments originated from both the Wawa and Atikokan facilities, the Company also entered a 10-year take-or-pay agreement with another customer to provide up to 90,000 metric tons of wood pellets annually from Atikokan. Any remaining pellets produced by the Atikokan facility would be shipped to Drax, but Defendants needed the Wawa facility to supply the majority of the production required under the contract with Drax going forward.

38. Rentech's inability to ship pellets at the required levels – combined with the ongoing costs of design modifications needed to bring the facilities up to adequate production levels – negatively impacted Rentech's cash flow and threatened its ability to service its debts. This situation created a significant risk to Rentech's ability to remain a going concern, as nearly all of the Company's assets and property were committed as collateral to the various loans against which Rentech had borrowed.

## SUBSTANTIVE ALLEGATIONS

39. Throughout the Class Period, Defendants: (1) misrepresented Rentech's financial ability to achieve operational success following the RNP divestiture; and

(2) overstated Rentech's revenue from continuing operations and the tax benefits it enjoyed from the RNP merger.[1]

**Defendants Made False Claims Regarding Rentech's Ability to Sufficiently Fund Operations While Bringing Wawa Up to Capacity**

40. On March 15, 2016, Rentech filed its Form 10-K for the period ended December 31, 2015. Within the Company's Form 10-K, Defendants stated the following:

> Upon closing the [RNP] Merger and completing the exchange with the GSO Funds, ***the Company is expected to have sufficient liquidity to fund the Company's approved investment and operating needs for at least the next twelve months***.

41. Defendants' statement in ¶40 was false and misleading because Defendants were aware that during 2015 and 2016, Rentech experienced revenue, cash flow, and liquidity challenges so severe that they threatened Rentech's ability to continue to service its debts. *See* ¶114.

42. On May 11, 2016, Rentech announced financial results for the period ended March 31, 2016. Also, on May 11, 2016, Defendants conducted a conference call with analysts to discuss the results.

43. On the May 11, 2016 conference call, Defendant Forman made the following statement:

> Since we last spoke back in March, we've had many developments that have positively transformed the structure and capitalization of the Company. The sale of Rentech Nitrogen on April 1 provided us with the opportunity ***to reposition Rentech and solely focus*** on our wood fibre businesses.

---

[1] Defendants' false and misleading statements are indicated by bold and italics.

44. Additionally, during the May 11, 2016 analyst call, Defendant Forman continued to insist that Rentech was singularly focused on executing its plan to transition into a pure-play, wood-fibre processing company:

> While the recently closed RNF and GSO transactions have granted us a stronger balance sheet ***and have allayed liquidity concerns***, we know full well this is not an opportunity to be squandered. ***We plan to use this new platform to enhance the value of our assets and improve the returns to our owners.***

45. Defendant Forman's statements in ¶¶43-44 were false and misleading because Defendants were aware that during 2015 and 2016, Rentech experienced revenue, cash flow, and liquidity challenges so severe that they threatened Rentech's ability to continue to service its debts. *See* ¶114. Defendant Forman's statements in ¶¶43-44 were also false and misleading and omitted to disclose the material fact that, by this time, Rentech had engaged Wells Fargo as an advisor to consider ways Rentech could generate enough revenue to service its debts through potential transactions involving the sale, transfer, or other disposition of all or a portion of Rentech's businesses or assets, or the equity interests in Rentech. *See* ¶115.

46. On August 10, 2016, Defendants conducted a conference call with analysts to discuss Rentech's financial results for the period ended June 30, 2016.

47. On the August 10, 2016 analyst conference call, Defendant Forman made the following statements regarding the Company's willingness sell UAN stock listed as an asset on its balance sheet to reduce Rentech's remaining debt load:

> **Q – Joseph Pratt**: . . . Are you going to make any moves to pay off GSO or are you just kind of hold the current situation?
>
> **A – Keith B. Forman**: I mean the UAN units have been underperforming since the close . . . for various reasons beyond anybody's control. So I think our lock up ends October 1, . . . so it's just not – it's not something that could just be cavalierly entered into.

48. Defendant Forman's statements in ¶47 were false and misleading because he failed to disclose that, as Defendants knew, during 2015 and 2016, Rentech experienced revenue, cash flow, and liquidity challenges so severe that they threatened Rentech's ability to continue to service its debts and that by this time, Rentech had engaged an advisor to consider ways Rentech could generate enough revenue to service its debts. *See* ¶¶114-15.

49. On November 10, 2016, Rentech held a conference call to discuss the Company's financial results. During the call, Defendants represented the following:

> **Q**: Okay. Maybe I'll ask it a different way, which is, Q3 industrial segment lost money, had negative EBITDA, and you've talked about when Wawa does get to full capacity, you've talked about what the range would be and I understand that that number might be influx, but it was a significantly positive number, mid-teens Canadian EBITDA is my memory.
>
> So the picture you're painting is that that plant will ramp over the next 12 months. So at some point, you cross over from losses into breakeven and then you crossover into making money. How far away are we from that division breaking even and not being a drag on EBITDA?
>
> **A: Keith B. Forman:** I don't have a date. ***I don't want to make anybody on this side of the phone call sound ignorant, but if certain factors change sooner, that date moves way towards us; and if certain factors don't change, that date is out there and also provides – also introduces other issues relative to, is this a sustainable goal to strive for.*** I mean, do you go three or four or five more quarters in negative cash flow land before you get to, "nirvana number."
>
> So ***I think that's the equation that we're pursuing here*** and we're working hard. We've reorganized up north bringing in some external, briefing up our external bench, more empowering the plant level folks eliminating some of the overhead there, but most importantly, I think, bringing into our shop aspects of our operations that were previously contracted for. So we've lowered the cost, made these functions part of our team. And I'm hopeful that that will work out. And as I said, there

> are other aspects of our cost structure and revenue side that have yet to be resolved. And if some of those push points have favorable outcomes from discussions we may or may not have, but hopefully will have that that dynamic can change meaningful.

50. Defendant Forman's statements in ¶49 were misleading because, as Defendants knew, during 2015 and 2016, Rentech experienced revenue, cash flow, and liquidity challenges so severe that they threatened Rentech's ability to continue to service its debts and that by this time, Rentech had engaged an advisor to pursue strategic alternatives to generate enough revenue to service its debts. *See* ¶¶114-15.

**Defendants Made False Statements When Reporting Rentech's Second Quarter 2016 Results**

51. On August 10, 2016, Rentech announced that it would not file its Form 10-Q on time because of an ongoing review of certain tax provisions pursuant to Generally Accepted Accounting Principles ("GAAP"). Specifically, the Company filed with the SEC a Form 12b-25, which stated:

> The Quarterly Report on Form 10-Q for the quarter ended June 30, 2016 (the "Form 10-Q") of Rentech, Inc. (the "Company") cannot be filed within the prescribed time period without unreasonable effort or expense because the Company is completing its review of GAAP tax provision allocations between discontinued operations and continuing operations for the quarter and six months ended June 30, 2015 in the financial statements presented in the Form 10-Q. The Company is also assessing any control impact of its tax provision preparation and review processes.

52. Still, Rentech issued unaudited financial results and Defendants discussed the quarterly performance.

53. On August 10, 2016, Defendants issued a press release (the "August 10, 2016 Press Release"), which was filed with the SEC, stating that the Company generated income from continuing operations of $79.8 million and income from discontinued operations of $232.2 million, net of tax, for the six months ending June 30, 2016, which included the closing date of the RNP divestiture.

54. As Defendants would later admit, however, the reported results were materially overstated. Specifically, Rentech should have recorded a loss from continuing operations for the six months ended June 30, 2016 of $19.9 million instead of a profit, and should have recorded income from discontinued operations of $310.6 million for the same period. This misrepresentation had the effect of reducing net income for the Company by $21.3 million for the period.

55. In the August 10, 2016 conference call with analysts that followed the issuance of second quarter results, Defendant Spain spoke about the review that required the delayed filing of the Form 10-Q, stating in relevant part:

> I'll start by mentioning that you may have seen our 12b-25 filings this morning regarding the delayed [filing] of our 10-Q. We do expect to file the Q within the next handful of days after completing a review of a GAAP tax provision allocations between discontinued and continued operations for the quarter and the six months ended June 30 of last year. ***We do anticipate that the review will not result in any changes to the financial statements included in our press release issued today.***

56. Defendant Spain's claim in ¶55 that the review would not result in any changes to the Company's financial statements was misleading and made without a reasonable basis. When the results of the review were announced five days later, investors learned Rentech had identified a material weakness in internal controls over allocation of GAAP income tax expenses between continuing and discontinued operations that required 2015 results to be recast. The control deficiencies would later require Rentech to restate the results contained in the August 10, 2016 Press Release.

57. On August 15, 2016, Rentech filed its Form 10-Q (the "August 15, 2016 Form 10-Q") for the period ended June 30, 2016. The filing coincided with the last day of the five-day window to cure an event of default under the GSO loan agreement, which required the timely filing of all quarterly financial reports.

58. In the August 15, 2016 Form 10-Q, Defendants again reported inaccurate financial results for the second quarter that, among other things, overstated Rentech's income from continuing operations and understated Rentech's income tax expense.

59. The August 15, 2016 Form 10-Q also announced that a review conducted "under the supervision and with the participation of the Company's management, including the Company's Chief Executive Officer [Defendant Forman] and Chief Financial Officer [Defendant Spain]" had concluded that Rentech suffered from a material weakness in financial controls.

60. Specifically, the August 15, 2016 Form 10-Q included the following explanation of the material weakness that delayed the filing until August 15, 2016:

> Additionally, during the quarter ended June 30, 2016, we determined that we did not maintain effective internal controls over the allocation of GAAP income tax expense between continuing and discontinued operations. Specifically, we did not perform certain procedures over the allocation of the GAAP tax provision between continuing and discontinued operations in the second quarter in accordance with our designed controls.

61. The August 15, 2016 Form 10-Q also disclosed that 2015 results were incorrectly reported as a result of the control deficiencies:

> This material weakness resulted in a material adjustment prior to finalizing the Company's presentation of GAAP income tax expense between continuing and discontinued operations in its recasted 2015 consolidated financial statements for the three-month and six-month periods ended June 30, 2015 as presented in this quarterly report.

62. The August 15, 2016 Form 10-Q stated, however, that 2016 results were unaffected:

> ***These control deficiencies did not result in a material misstatement to our consolidated financial statements for the quarter ended June 30, 2016.***

63. As investors later learned, the reported results for the second quarter 2016 were misstated due the same material weaknesses. *See* ¶¶97-106; 121-141.

64. The August 15, 2016 Form 10-Q included additional financial information not previously included in Rentech's August 10 Press Release that Defendants materially misstated. Specifically, the August 15, 2016 Form 10-Q included the following statement regarding the tax benefits Rentech incurred as a result of the RNP merger:

> For the three months ended June 30, 2016, the Company recorded an income tax expense of $22.7 million, ***consisting of a $109.5 million income tax benefit in continuing operations and a $132.2 million income tax expense in discontinued operations.*** For the six months ended June 30, 2016, the Company recorded an income tax expense of $23.5 million, ***consisting of a $111.9 million income tax benefit in continuing operations and a $135.4 million income tax expense in discontinued operations***.

65. As Defendants later admitted, the Company should have recorded approximately $100 million less in income tax benefit in continuing operations, approximately $80 million more in tax benefits for discontinued operations, and about $21 million more in income tax expense.

66. Additionally, the August 15, 2016 Form 10-Q disclosed that Rentech's reported effective tax rate diverged significantly from the federal statutory rate:

> ***The Company's effective income tax rate*** (income tax benefit as a percentage of loss from continuing operations before income taxes) ***was -349% for the six months ended June 30, 2016.***

67. The August 15, 2016 Form 10-Q also reported that Rentech was able to use credits for prior losses to offset the gains from the sale of RNP that produced a tax benefit for continuing operations:

> The difference between the United States federal statutory rate of 35% and the effective rate primarily was attributable to the outside basis difference in foreign subsidiaries, impact of foreign earnings, impact of state taxes, utilization of net operating loss ("NOL") carryforwards,

> research and development ("R&D") credits and alternative minimum tax ("AMT") credits.
>
> Due to the gain on sale of RNP during the three months ended June 30, 2016, the Company utilized all of the federal NOL carryforwards, R&D credits and AMT credit carryforwards. ***The Company released $79.5 million of valuation allowance and this resulted in a tax benefit for continuing operations*** . . . .

68. As Defendants later admitted, however, Defendants improperly released the $79.5 million valuation allowance, which resulted in a miscalculation of the effective tax rate.

**Defendants Made False Statements When Reporting Rentech's Third Quarter 2016 Results**

69. On November 9, 2016, Rentech filed its Form 10-Q quarterly report for the period ended September 30, 2016 with the SEC (the "November 9, 2016 Form 10-Q"). The November 9, 2016 Form 10-Q made similar misrepresentations to those contained in the August 15, 2016 Form 10-Q.

70. Specifically, the November 9, 2016 Form 10-Q stated that for the nine months ending September 30, 2016, Rentech generated income from continuing operations of $70.1 million (which included a third quarter loss of $9.7 million), and income from discontinued operations of $231.8 million (which included a third quarter loss of $401,000).

71. As Defendants would later admit, however, the reported results were materially overstated. Specifically, Rentech should have recorded a loss from continuing operations for the nine months ended September 30, 2016 of $30.3 million instead of a profit, and should have recorded income from discontinued operations of $312.3 million.

72. The November 9, 2016 Form 10-Q repeated Defendants' earlier statement regarding the material weakness in Rentech's internal controls over financial reporting:

> [W]e determined that we did not maintain effective internal controls over the allocation of GAAP income tax expense between continuing and discontinued operations. Specifically, we did not perform certain procedures over the allocation of the GAAP tax provision between continuing and discontinued operations in the second quarter in accordance with our designed controls.

73. The November 9, 2016 Form 10-Q also repeated Defendants' earlier claim that the results were unaffected by the material weakness in allocating between continuing and discontinued operations:

> ***These control deficiencies did not result in a material misstatement to our consolidated financial statements for the quarter ended September 30, 2016.***

74. This statement in ¶73 was false and misleading because the results were incorrectly reported as a result of the material weaknesses in financial controls over allocating between continuing and discontinued operations.

75. Further, the November 9, 2016 Form 10-Q disclosed that Rentech had recorded adjustments to deferred tax assets and liabilities during the period ended June 30, 2016. Specifically, the November 9, 2016 Form 10-Q made the following disclosure:

> In the Consolidated Statements of Operations included in [August 15, 2016 Form 10-Q], the Company incorrectly reported income tax expense between continuing and discontinued operations for the three and six months ended June 30, 2016.

76. The November 9, 2016 Form 10-Q described the inaccurate results in Rentech's previously-reported second quarter filings as follows:

> Income tax benefit included in income from continuing operations, net of tax was understated by $2.5 million and income tax expense included in income from discontinued operations, net of tax, was understated by $2.5 million.

77. The November 9, 2016 Form 10-Q included the following claim:

> ***The total tax expense for the three and six months ended June 30, 2016 was correctly reported***.

78. The November 9, 2016 Form 10-Q also included the following representations regarding the effectiveness of the corrective actions taken in response to incorrectly reporting second quarter income tax benefits:

> ***The Company has corrected the income tax (benefit) expense between continuing and discontinued operations in the three months ended September 30, 2016,*** which had no impact on gross profit, operating income, net income, cash flows or the balance sheet.

79. The statements in ¶¶77-78 were false and misleading because the income tax benefit and expense allocation between continuing and discontinued operations continued to be incorrectly reported as a result of the material weaknesses in Rentech's internal controls over financial reporting.

80. Additionally, the November 9, 2016 Form 10-Q included the following false statement regarding the tax benefits Rentech incurred as a result of the RNP merger, stating in relevant part:

> For the three months ended September 30, 2016, the Company recorded an income tax benefit of $3.1 million, ***consisting of a $6.8 million income tax benefit in continuing operations and a $3.7 million income tax expense in discontinued operations.*** For the nine months ended September 30, 2016, the Company recorded an income tax expense of $20.4 million, ***consisting of a $118.7 million income tax benefit in continuing operations and a $139.1 million income tax expense in discontinued operations***.

81. This statement in ¶80 was false and misleading because as Defendants later admitted, for the nine months ended September 30, 2016, the Company should have recorded approximately $100 million less in income tax benefit in continuing operations, approximately $80 million more in tax benefits for discontinued operations, and about $21 million more in income tax expense.

82. The November 9, 2016 Form 10-Q also disclosed that Rentech's effective tax rate diverged significantly from the federal statutory rate:

> The Company's effective income tax rate (income tax benefit as a percentage of loss from continuing operations before income taxes) was 244% for the nine months ended September 30, 2016.

83. The November 9, 2016 Form 10-Q also incorrectly claimed that Rentech was able to use credits for prior losses to offset the gains from the sale of RNP that produced a tax benefit for continuing operations:

> The difference between the United States federal statutory rate of 35% and the effective rate primarily was attributable to the outside basis difference in foreign subsidiaries, impact of foreign earnings, impact of state taxes, utilization of net operating loss ("NOL") carryforwards, research and development ("R&D") credits and alternative minimum tax ("AMT") credits.
>
> Due to the gain on sale of RNP during the three months ended June 30, 2016, the Company utilized all of the federal NOL carryforwards, R&D credits and AMT credit carryforwards. ***The Company released $79.5 million of valuation allowance and this resulted in a tax benefit for continuing operations.*** . . .

84. As Defendants later admitted, however, Defendants improperly released the $79.5 million valuation allowance, which resulted in a miscalculation of the effective tax rate.

85. On November 10, 2016, Rentech issued an earnings release announcing the Company's financial results for the third quarter of 2016 (the "November 10, 2016 Press Release").

86. The November 10, 2016 Press Release repeated much of the inaccurate financial information contained in the November 9, 2016 Form 10-Q, including overstated income from continuing operations and understated tax expenses.

## THE TRUTH BEGINS TO EMERGE

87. On February 21, 2017, prior to the market opening, Rentech issued a press release (the "February 21, 2017 Press Release") announcing the cessation of all production at the Company's Wawa facility and the reduction of operations and production at its Atikokan facility.

88. The February 21, 2017 Press Release included the following disclosure:

> This decision is based in part on our review of the work by a third-party engineering firm to identify necessary capital improvements. While we believe that the issues we have been experiencing at the facility can be resolved with additional capital investments, ***we have concluded that it is not economical to pursue those investments or to continue to operate the facility at this time***.

89. The February 21, 2017 Press Release also included the following disclosure:

> **Strategic Alternatives Review Process**
>
> Rentech intends to explore strategic alternatives for the Wawa facility and for the Company as a whole. In conjunction with this process and ***to address potential future liquidity needs***, Rentech is considering strategic alternatives that may include, but are not limited to, a sale of the Company, a merger or other business combination, a sale of all or a material portion of the Company's assets or a recapitalization.
>
> ***Rentech has retained Wells Fargo Securities, LLC to assist in the strategic alternatives review process***. . . .
>
> If an appropriate strategic alternative is not achieved on a timely basis, and if the Company were otherwise unable to secure additional sources of funds to address potential future liquidity needs, there could be a

> material adverse effect on the Company's business, results of operations, and financial condition.

90. Following the announcement, the price of Rentech common stock plunged $1.31 per share, or 47.6%, as compared to market close on February 17, 2017, on unusually high trading volume of more than three million shares trading – nearly 10 times the average daily trading volume. By February 28, 2017, the Company's common stock had plummeted more than 72% in six days.

91. On March 16, 2017, Rentech filed a notice with the SEC that it was unable to file its annual report on Form 10-K because it had not completed a review of: (i) impairments of fixed assets related to its Wawa and Atikokan wood pellet manufacturing facilities; (ii) impairments related to its Fulghum Fibres US operations; and (iii) its provision for income tax expense.

92. On March 16, 2016, Rentech separately filed a Form 8-K with the SEC (the "March 16, 2016 Form 8-K") that provided select, unaudited results for the fourth quarter and fiscal year ended December 31, 2016.

93. The March 16, 2016 Form 8-K included the following going concern warning:

> At this time, we believe we have sufficient liquidity from cash on hand and expected working capital to fund operations and corporate activities through calendar year 2017, but we may have costs associated with idling the Wawa facility and other events could arise that could increase our liquidity needs in 2017. ***We may also need additional liquidity to fund corporate activities through the first quarter of 2018. As a result, management expects to report in the Form 10-K substantial doubt about our ability to continue as a going concern over the next twelve months through March 2018***, and we expect the report of the Independent Registered Public Accounting Firm for our consolidated financial statements for the fiscal year ended December 31, 2016 to disclose the same.

94. On March 16, 2017, Rentech conducted a conference call with analysts to discuss the reported results.

95. Paul Summers ("Summers"), Rentech's recently appointed CFO, discussed with investors that Rentech was unable to file its 10-K on time, stating in relevant part:

> As you know**,** we are delayed in filing our Form 10-K due to our review of accounting impairments and our book tax provision. **. . .** We expect to file our Form 10-K with complete financial results, once we complete our analysis and review of the impairments and the tax provision.

96. Upon the release of this news, the price of Rentech common stock fell from $0.74 to $0.59 per share, on unusually high trading volume.

97. On April 4, 2017, Rentech filed a Form 8-K (the "April 4, 2017 Form 8-K") informing investors that the Company's previously-issued financial statements should not be relied upon. Specifically, the April 4, 2017 Form 8-K included the following statement:

> The Company is restating [certain prior] financial statements to correct errors in its provision for income taxes involving non-cash deferred taxes and the allocation of tax benefit and tax expense between continuing operations and discontinued operations.

98. The April 4, 2017 Form 8-K revealed that Defendants previously failed to utilize the appropriate tax basis for CVR units when accounting for the RNP divestiture. Specifically, Rentech made the following disclosure:

> The Company recorded adjustments to deferred tax assets and liabilities related to the merger during the three months ended June 30, 2016. Based upon further review of the accounting for the transaction in connection with the preparation of its financial statements for the year ended December 31, 2016, ***the Company determined that a book and tax basis difference existed of approximately $60 million related to the investment in CVR immediately following the transaction***.

99. The April 4, 2017 Form 8-K revealed that the error resulted in Rentech understating its income tax expense. Specifically, the April 4, 2017 Form 8-K stated the following:

> The Company has therefore concluded that ***it should have recorded a non-cash deferred tax liability, which would have resulted in approximately $21.3 million of additional income tax expense in the quarter and six months ended June 30, 2016 and approximately $19.9 million of additional tax expense for the nine months ended September 30, 2016*** (due to a reduction of approximately $1.4 million in income tax expense for the three months ended September 30, 2016).

100. The April 4, 2017 Form 8-K also revealed that, in connection with the need to record additional tax expense, Rentech was required to restate its income from continuing operations due to improperly classifying the release of a valuation allowance. Specifically, the April 4, 2017 Form 8-K stated the following:

> The Company has also determined that ***the allocation of tax benefit and expense between continuing operations and discontinued operations for the affected periods should be amended due to the release of a valuation allowance that was improperly classified***.
>
> . . . . ***The Company expects income tax benefit from continuing operations and income tax expense from discontinued operations to be reduced by approximately $100 million and $80 million, respectively,*** for the three and six months ended June 30, 2016, as well as the nine months ended September 30, 2016 due to the classification error of the valuation allowance release and the need to record the deferred tax liability for the CVR Common Units received in the merger transaction.

101. On April 6, 2017, Rentech filed its Form 10-K (the "April 6, 2017 Form 10-K") for the fiscal year ended December 31, 2016.

102. In the April 6, 2016 Form 10-K, Rentech announced the extent of the restatement required by its failure to comply with internal controls as required by GAAP. Specifically, Rentech made the following disclosures:

> These restatements and the material weakness reported herein are due to an incorrect calculation of the Company's income tax provisions and affected non-cash deferred taxes and the allocation of tax benefit and tax expense between continuing operations and discontinued operations.

103. The April 6, 2016 Form 10-K confirmed the restatement was required because of the material weakness in allocating tax expenses, which was first disclosed publicly on August 15, 2016, stating:

> Additionally, ***as we previously reported in 2016***, there was a deficiency in effective internal controls over the allocation of GAAP income tax expense between continuing and discontinued operations. ***Specifically, we did not perform certain procedures over the allocation of the GAAP tax provision between continuing and discontinued operations in the second quarter of 2016 in accordance with our designed controls***.

104. The April 6, 2016 Form 10-K provided additional information about when the material weakness was first identified in connection with the recast 2015 results:

> In our Quarterly Report on Form 10-Q for the six months ended June 30, 2016, ***this control deficiency resulted*** in a material adjustment prior to finalizing our presentation of GAAP income tax expense between continuing and discontinued operations ***in our recasted 2015 consolidated financial statements*** for the three-month and six-month periods ended June 30, 2015.
>
> In preparing our year-end financial statements for 2016, we identified ***that the control deficiency*** related to income taxes, ***as described above, also*** affected our financial results for the three and six months ended June 30, 2016 and the three and nine months ended September 30, 2016.

105. The April 6, 2016 Form 10-K also reiterated the extent to which the material weakness required restatement of financial results:

> As a result, we determined that the allocation of tax benefit and expense between continuing operations and discontinued operations for the affected periods should be revised. ***We determined that the income tax benefit from continuing operations and income tax expense from discontinued operations should be reduced by approximately $100 million and $80 million***, respectively, for the three and six months ended June 30, 2016, as well as the nine months ended September 30, 2016. In addition, ***we concluded that we should have recorded a non-cash deferred tax liability, which would have resulted in approximately $20 million of additional income tax expense in the quarter ended June 30, 2016. The control deficiency resulted in a restatement of our financial statements*** for the three and six months ended June 30, 2016 and the three and nine months ended September 30, 2016[.]

106. Furthermore, the April 6, 2017 Form 10-K reiterated the extent of the restatement and its causes:

> the Company determined that a book and tax basis difference existed of approximately $60 million related to the investment in CVR immediately following the transaction. The Company has therefore concluded that ***it should have recorded a non-cash deferred tax liability, which would have resulted in approximately $21.3 million of additional income tax expense in the three and six months ended June 30, 2016 and approximately $19.9 million of additional income tax expense for the nine months ended September 30, 2016*** (due to a reduction of approximately $1.4 million in income tax expense for the three months ended September 30, 2016).
>
> The Company has also determined that the allocation of tax benefit and expense between continuing operations and discontinued operations for the affected periods should be amended ***due to the release of a valuation allowance that was improperly classified***. The change in allocation of this item does not impact consolidated net income. ***The income tax benefit from continuing operations and income tax expense from discontinued operations should be reduced by***

> ***approximately $100 million and $80 million***, respectively, for the three and six months ended June 30, 2016, as well as the nine months ended September 30, 2016 due to the classification error of the valuation allowance release and need to record the deferred tax liability for the CVR units received in the Merger. ***As a result, income from continuing operations was overstated, income from discontinued operations, net of tax was understated, net income was overstated***, except for the three months ended September 30, 2016 when it was understated, ***and deferred income taxes (liabilities) was understated***.

107. On December 17, 2017, Rentech filed for Chapter 11 bankruptcy and commenced liquidation proceedings.

## ADDITIONAL SCIENTER ALLEGATIONS

108. The statements in ¶¶40, 43-44, 47, and 49 were false and misleading because Defendants omitted material information regarding ongoing liquidity issues and formalized efforts to sell Rentech and/or its assets.

109. Specifically, between March 11, 2016 and November 9, 2016, Defendants made the following misrepresentations regarding Rentech's operations that had the effect of causing Rentech's stock price to trade at artificially-inflated prices:

- that the Company had sufficient liquidity to fund approved investments and operating needs until at least March 2017 (¶40);
- that the RNP divestiture positioned Rentech to focus "solely" on its wood fibre business (¶43);
- that Defendants were focused on enhancing the value of Rentech's assets and improving returns to investors (¶44);
- that dismissed the notion the Company would attempt to sell UAN stock to reduce Rentech's remaining debt load when the lockup expired (¶47); and

- that the Company was pursuing a strategy that could be successful even if the ramp-up of Wawa required the wood-pellets segment to operate with negative cash follow throughout 2017 (¶49).

110. Defendants acted with at least deliberate recklessness in making these false and misleading statements because they possessed adverse, undisclosed information that contradicted the claims.

111. The statements in ¶¶53, 55, 62, 64, 66-67, 69-70, 73, 77-78, 80, and 83 were false and misleading because: (1) Rentech's second and third quarter 2016 results did not comply with GAAP and were materially inaccurate; and (2) they included inaccurate claims about the adequacy of the Company's internal review into its ability to allocate between continuing and discontinued operations.

112. Specifically, the second and third quarter 2016 financial results included the following misrepresentations that had the effect of causing Rentech's stock price to trade at artificially-inflated prices:

- income from continuing operations that was materially overstated for the six months ended June 30, 2016 and the nine months ended September 30, 2016 (¶¶53, 70);
- net income tax expense that was materially understated (¶61; ¶76);
- the tax benefits for continuing operations resulting from the improper release of the valuation allowance that were overstated (¶67; ¶83);
- false assurances that review of a GAAP tax provision allocations between discontinued and continued operations for the quarter and the six months ended June 30, 2016 conducted in August 2016 would not result in any changes to the financial statements (¶55);
- false claims that the control deficiencies that required 2015 results to be recast did not result in a material misstatement to Rentech's

consolidated financial results for the periods ending June 30, 2016 or September 30, 2016 (¶62; ¶73);

- inaccurate effective income tax rates for the six months ended June 30, 2016 and the nine months ended September 30, 2016 (¶66; ¶78);
- express statements that, after a net neutral income tax expense adjustment in November 2016, the total tax expense the six months ended June 30, 2016 was correctly reported (¶77); and
- the claim made in November 2016 that the Company had corrected the income tax expense for the three months ended September 30, 2016. (¶78)

113. Defendants acted with at least deliberate recklessness when they issued these false and misleading statements despite numerous red flags indicating the financial results and the limited impact of the identified control deficiencies were materially misstated.

**Rentech's Bankruptcy Filings Demonstrate that Defendants Knew About Undisclosed Liquidity Issues That Threatened Rentech's Operations Throughout the Class Period**

114. Subsequent admissions made in Rentech's bankruptcy filings confirm that, by the start of the Class Period, increasing costs at Wawa and Atikokan threatened Rentech's ability to service its loans. Specifically, according to Rentech's bankruptcy filing made public on January 3, 2018:

> During 2015 and 2016, Rentech began to experience revenue, cash flow, and liquidity challenges due in large part to construction and operating issues with the Canadian wood pellet facilities, reduced sales for the wood pellet businesses located in the Northeastern United States operated through NEWP, and reduced demand for the wood chipping services provided by Fulghum US in the Southeastern United States. The increasing strain on Rentech's liquidity threatened its ability to continue to service its debts.

115. A bankruptcy filing made on January 15, 2018, titled Debtors' Amended Combined Disclosure Statement and Chapter 11 Plan of Liquidation, further revealed that, shortly after the Class Period began, Rentech engaged an advisor to consider ways Rentech could generate enough revenue to service its debts. According to January 15, 2018 disclosure:

> On April 19, 2016, Rentech, Inc. engaged Wells Fargo Securities, LLC ("Wells Fargo") to assist in the process of reviewing strategic alternatives to address Rentech's liquidity needs. Specifically, Wells Fargo was retained to assist in evaluating potential transactions involving the sale, transfer, or other disposition of all or a portion of Rentech's businesses or assets, or the equity interests in Rentech, Inc.

116. Defendants concealed these material facts from investors during the Class Period, causing their positive statements about Rentech's liquidity and ability to fund operations to be misleading.

**Rentech's Small Size and Limited Personnel in Its Accounting Department Support the Inference That Defendants Were Personally Involved in Preparing the Misleading Financial Statements**

117. As of December 31, 2015, Rentech had 716 non-unionized and salaried employees, and 223 unionized employees. Of these employees, 460 were employed by Fulghum, 77 were employed in Canada by Rentech, 97 were employed by NEWP, and 268 were employed by RNP, leaving just 37 employees in the remaining departments.

118. As of December 31, 2016, Rentech had 606 non-unionized and salaried employees, and 19 unionized employees. Of these employees, 421 were employed by Fulghum, 87 were employed in Canada by Rentech subsidiaries, and 86 were employed by NEWP, leaving just 31 employees in the remaining departments.

119. Upon information and belief, between April 2016 and February 2017, Rentech's accounting and finance department consisted of approximately 10 individuals in the Company's Los Angeles, California office, approximately six individuals in the Company's Jaffrey, New Hampshire office, and two individuals in the Company's Canada office.

120. This staff was directly overseen by Defendant Spain. The press release announcing that Defendant Spain was appointed as CFO included the statement that he "will be responsible for overseeing the finance and accounting functions for both companies."

**The Specific GAAP Provisions and Violations of Rentech's Internal Controls Indicate Defendants Knew, or Were Deliberately Reckless in Not Knowing, About the Accounting Errors**

121. GAAP requires every company disposing of major lines of business to separately report the gains and losses relating to that discontinued business segment. *See* FASB ASC 205-20-45-1; IFRS 5(32) and IFRS 5. Components that comprise the business segment's operations and cash flows that can be clearly distinguished operationally and for financial reporting purposes from the rest of the entity must be classified as discontinued operations. *Id.*

122. The Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 740-10-25-19 provides that "because tax laws and financial accounting standards differ in their recognition and measurement of assets, liabilities, equity, revenues, expenses, gains, and losses, differences arise between . . . the tax bases of assets or liabilities and their reported amounts in financial statements."

123. A valuation allowance is a balance sheet line item that offsets all or a portion of the value of a company's deferred tax assets because the company does not expect it will be able to realize this value. To release a valuation allowance is to recognize a deferred tax asset. GAAP also requires income to be generated in the

current year when releasing a valuation allowance. Specifically, ASC 740-270-25-4 states:

> The tax benefit of an operating loss carryforward from prior years shall be included in the effective tax rate computation if the tax benefit ***is expected to be realized as a result of ordinary income in the current year***. Otherwise, the tax benefit shall be recognized in the manner described in paragraph 740-270-45-4 in each interim period ***to the extent that income in the period*** and for the year to date is available to offset the operating loss carryforward or, in the case of a change in judgment about realizability of the related deferred tax asset in future years, the effect shall be recognized in the interim period in which the change occurs. [FIN 18, paragraph 20]

124. Rentech was forced to restate its financial results because it failed to comply with these standards.

125. In August and November 2016, Rentech explained the method it used to allocate between continuing and discontinued operations when calculating tax benefits, stating:

> The allocation to discontinued operations was determined using the incremental method by subtracting the benefit that was generated from continuing operations from the provision for the Company as a whole.

126. In April 2017, Rentech admitted its prior results had to be restated because:

> [W]e did not perform certain procedures over the allocation of the GAAP tax provision between continuing and discontinued operations in the second quarter of 2016 in accordance with our designed controls.

127. The admission indicates the statement that Rentech had employed the incremental method to allocate between continuing and discontinued operations was inaccurate.

128. Further, to calculate taxes from the RNP divestiture, GAAP required Rentech to utilize the tax basis for the common units, not the book value. Book

value and tax basis can, and do, differ significantly because of adjustments, including depreciation of assets, different inventory valuation methods, and the cost of maintenance and repairs.

129. Defendants, however, used the wrong number. Therefore, Rentech failed to record a tax liability on the $60 million difference between the two numbers.

130. Further, Rentech's income from continuing operations had benefited from the release of a $79.5 valuation allowance.

131. Rentech utilized federal net operating losses ("NOLs"), among other things, to offset income attributed to continuing operations, and recognized the tax benefits from those previously written-off assets by releasing the valuation allowance. This was improper because an accurate allocation between continuing and discontinuing operations would have shown that Rentech's continuing operations lost money each quarter in 2016 and, therefore, the valuation allowance could not be attributed to those earnings.

132. When corrected, those benefits shifted to discontinued operations and were not a benefit to continuing operations at all. The net result was an increase of Rentech's tax expense of more than $20 million, which should have been recorded on August 15, 2016.

133. If this amount was correctly record, it would have almost exactly offset the amount of cash Rentech claimed to have on hand at the end of 2016 on the Company's books.

**Defendants Ignored Red Flags Indicating Rentech's Financial Statements Were Inaccurate**

134. Defendants caused Rentech to delay issuing the August 15, 2016 Form 10-Q for five days to review GAAP tax provision allocations between discontinued operations and continuing operations.

135. The review concluded that Rentech did not maintain effective internal controls over the allocation of GAAP income tax expense between continuing and discontinued operations as of June 30, 2016.

136. On August 15, 2016, Defendants stated that the material weakness resulted in a material error in Rentech's consolidated financial statements for the three-month and six-month periods ended June 30, 2015, which had to be "recast."

137. The review also considered whether the material weaknesses in Rentech's internal controls over the allocation of GAAP income tax expense between continuing and discontinued operations caused a misstatement of the results for the period ended June 30, 2016.

138. Yet, Defendants incorrectly stated on August 15, 2016 that, after review, the control deficiencies did not result in a material misstatement to financial results for the period ended June 30, 2016.

139. On November 9, 2016, Defendants admitted that the control deficiencies had caused Rentech to incorrectly report income tax expense between continuing and discontinued operations for the three and six month periods ended June 30, 2016, which required $2.5 million in income tax benefit to be shifted in a net-neutral adjustment.

140. Defendants, however, incorrectly stated on November 9, 2016 that the total tax expense for the period ended June 30, 2016 was correctly reported.

141. Defendants thus identified a material weakness in financial reporting, claimed to have reviewed Rentech's financial results to ensure the current results were correctly reported despite the control deficiencies, assured investors that the current results were accurate, and subsequently revealed that the results were dramatically misstated the entire time.

**Accurate Disclosures Regarding the True Extent of the Material Weaknesses Rentech Suffered Would Have Caused a Default on the GSO Lending Agreement in August 2016**

142. In connection with the RNP divestiture, on March 11, 2016, Rentech executed the First A&R GSO Credit Agreement. The First A&R GSO Credit Agreement provided that certain indebtedness would be retired through transfer of CVR common units to the GSO lenders. Specifically, Rentech would use 17.0 million CVR Common Units received in the merger and $10.0 million of cash to: (i) repurchase and retire all $100 million of its Series E Convertible Preferred Stock or the Preferred Stock held by certain funds managed by or affiliated with GSO Capital Partners LP; and (ii) repay approximately $41.7 million of debt under its credit agreement with the GSO Funds.

143. The GSO agreements generally did not allow Rentech to obtain debt financing without the consent of the GSO lenders. In its Form 10-K filed on March 15, 2016, Rentech stated that it expected to have sufficient liquidity to fund the Company's approved investment and operating needs for at least the next 12 months.

144. The Second A&R GSO Credit Agreement defined Events of Default as including the disclosure and notice provisions found in a separate agreement. Specifically, the Second A&R GSO Credit Agreement stated as follows:

> 6.01 **Events of Default.** If any of the following events ("Events of Default") shall occur:
>
> * * *
>
> (b) (i) Borrower shall fail to provide Administrative Agent with the reports required to be delivered under Section 5.01(b) on the date required for such delivery or ***(ii) Parent Guarantor shall fail to provide Administrative Agent with the reports required to be delivered under Section 7(b) of the Guaranty Agreement on the date required for such delivery;*** and in each case, ***such failure shall continue for five (5) Business Days***;

145. The Guaranty Agreement to which the Second A&R GSO Credit Agreement pointed was made public as an exhibit to a Form 8-K filed with the SEC on April 7, 2017. In relevant part, the Guaranty Agreement required Rentech to make the following disclosures under Section 7(b):

> 7. **Affirmative Covenants**. Parent Guarantor shall, and shall cause each Subsidiary thereof to:
>
> ****
>
> (b) <u>Reporting Requirements</u>. Furnish to Administrative Agent or cause to be furnished to Administrative Agent:
>
> (i) as soon as available, but in any event within ninety (90) days after the end of each of its fiscal years, ***Parent Guarantor's annual audited consolidated financial statements, including all notes thereto, which statements shall include a consolidated statement of financial position as of the end of the relevant fiscal year and a statement of operations and a statement of cash flows for such fiscal year***, all setting forth in comparative form the corresponding figures from the previous fiscal year, all prepared in conformity with GAAP and accompanied by an unqualified report and opinion of independent certified public accountants with an accounting firm of national standing and reputation, which shall state that such financial statements, in the opinion of such accountants, present fairly, in all material respects, the consolidated financial position of Parent Guarantor as of the date thereof and the results of its operations and cash flows for the period covered thereby in conformity with GAAP, consistently applied;
>
> (ii) as soon as available, ***but in any event no later than forty-five (45) days after the end of each of the first three fiscal quarters of each fiscal year of Parent Guarantor, Parent Guarantor's quarterly unaudited consolidated financial statements prepared in respect of such fiscal quarter and for the portion of Parent Guarantor's fiscal year then ended***, in each case setting forth in comparative form, as applicable, the figures for the corresponding fiscal quarter of the previous fiscal

> year and the corresponding portion of the previous fiscal year, all in reasonable detail, ***certified by a Responsible Officer of Parent Guarantor as fairly presenting the financial condition, results of operations, shareholders' equity and cash flows of Parent Guarantor in accordance with GAAP***, subject only to normal year-end audit adjustments and the absence of footnotes;
>
> (iii) concurrently with such distributions or filing with the SEC, copies of all financial reports distributed by or on behalf of Parent Guarantor to all of its shareholders;

146. When an Event of Default occurred, including Rentech's inability to provide the required notices under Section 7(b) of the Guaranty Agreement, the Lenders obtained the right to demand repayment of the debt in full.

147. The Second A&R GSO Credit Agreement during the Class Period included dramatic consequences should Rentech default:

> [T]he obligations under the Second A&R GSO Credit Agreement and the guarantees are secured by a lien on substantially all of the Loan Parties' tangible and intangible property, and by a pledge of all of the shares of stock and limited liability company interests owned by the Loan Parties, of which the Loan Parties now own or later acquire more than a 50% interest, subject to certain exceptions.

148. Defendants were thus required by the Second A&R GSO Credit Agreement and SEC disclosure requirements to provide ***unaudited*** quarterly results but ***audited*** annual financial results. Defendants were also required to report accurate financial results that complied with GAAP.

149. Rentech, however, was unable to do both at the same time. If Rentech had accurately disclosed that further delay was required to issue results that complied with GAAP, the further delay of the results would have caused an immediate default on August 16, 2016.

150. Because of the terms of the GSO lending agreement, any default arising from a failure to issue statements that complied with GAAP, however, would not occur until the results were audited in 2017. Rentech itself was solely responsible

for ensuring that its quarterly financial reports complied with GAAP, giving Defendants the opportunity to delay an event of default.

151. Critically – and unknown to investors at the time – Defendants had engaged Wells Fargo to sell the Company or its assets before Rentech ran out of money to fund operations and ongoing repairs at Wawa in February 2017 (Defendants previously indicated Rentech has sufficient funds to operate through March 2017).

152. Defendants thus extended their opportunity to salvage value from Rentech until February 15, 2017, when the Board of directors decided to idle the Wawa plant – effectively ending Rentech's chance of ever generating sufficient earnings to satisfy its debt obligations.

**Rentech's Collapse Would Wipe Out Defendant Forman's Personal Financial Interest in the Company**

153. On December 10, 2014, Defendant Forman was named CEO and President of Rentech.

154. On December 22, 2014, Defendant Forman filed a Form 3 Initial Statement of Beneficial Ownership indicating he owned no common stock of Rentech.

155. According to a Form 4 filed with the SEC, on December 30, 2014 Defendant Forman received an initial equity award from Rentech.

156. According to the Form 4, on December 30, 2014, Defendant Forman received 1,008,265 performance stock units, which could be earned based on Rentech's total shareholder return as measured initially on December 9, 2017.

157. According to the Form 4, on December 30, 2014, Defendant Forman also received 1,102,491 options to purchase common stock with an exercise price of $1.24, which was subject to a vesting schedule whereby one-fourth of the options vested on December 9, 2015, and on each monthly anniversary thereafter one-forty-

eighth of the award would vest such that the options would be fully vested on December 9, 2018.

158. On August 13, 2015, Defendant Forman purchased 22,000 shares of Rentech common stock at an average price of $0.6773.

159. On August 20, 2015, Rentech effected a 10-1 reverse stock split.

160. Also on August 20, 2015, Defendant Forman purchased 3,000 shares of Rentech common stock at $6.0427 per share, bringing his total holdings to 5,200 after accounting for the reverse split.

161. Defendant Forman's two purchases of Rentech stock made one week apart in August 2015 are his only reported open market purchases of Rentech common stock.

162. According to the Definitive Proxy Statement filed with SEC on April 28, 2016, Defendant Forman beneficially owned 32,762 total shares, which included 27,562 options fully exercisable within 60 days.

163. On December 14, 2015, options for Defendant Forman to purchase 400,000 shares of Rentech stock vested with an exercise price of $3.03.

164. On December 14, 2016, Defendant Forman received 200,000 restricted stock units, which were each convertible to one share of Rentech common stock, with one third of the restricted stock units vesting on each of the first three anniversaries of December 14, 2016.

**Rentech's Collapse Would Wipe Out Defendant Spain's Personal Financial Interest in the Company**

165. On December 7, 2015, Defendant Spain was appointed as Rentech's CFO. He had been employed by the Company for the previous four years.

166. On December 14, 2015, Defendant Spain received 30,000 options to purchase Rentech common stock at an exercise price of $3.03, one third of which would vest on each of the next three anniversaries of the grant. The filing indicated that after accounting of tax-related transactions, Defendant Spain held 25,979 shares

of Rentech common stock. Defendant Spain has not reported any Rentech stock transactions on Form 4 or otherwise since December 14, 2015.

167. Additionally, according to the Definitive Proxy Statement filed with SEC on April 28, 2016, Defendant Spain beneficially owned 33,469, which included 8,063 options fully exercisable within 60 days.

**Suspicious Departures Support An Inference of Intentional Wrongdoing**

168. On September 23, 2016, Rentech replaced its auditor, PricewaterhouseCoopers, with BDO USA, LLP.

169. On November 3, 2016, Rentech issued a press release announcing Summers as the Company's new CFO effective November 11, 2016. Summers served as Rentech's Vice President and Treasurer immediately prior to his appointment as CFO. This change followed the resignation of Defendant Spain, who held the CFO position for less than one year.

170. On February 10, 2017, Rentech filed a Form 8-K announcing that on February 6, 2017, John A. Williams ("Williams") had submitted his resignation effective immediately as a member of the Company's Board of Directors, including as a member of Rentech's Audit Committee and a member of the Nominating and Corporate Governance Committee.

## LOSS CAUSATION

171. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of the Company's common stock. Defendants' conduct, moreover, operated as a fraud or deceit on Class Period purchasers of the Company's common stock by failing to disclose, and misrepresenting, the adverse facts detailed herein. As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of the Company's common stock declined

significantly as the prior artificial inflation dissipated from the Company's stock price.

172. As a result of the purchases of the Company's common stock during the Class Period, Plaintiff and the other members of the Class suffered economic loss (damages) under the federal securities laws. Defendants' false and misleading statements had the intended effect, and caused, the Company's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $3.91 per share on August 17, 2016.

173. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of the Company's business and prospects. As the truth regarding the Company was revealed to the market, the price of the Company's common stock fell significantly. These declines removed the inflation from the price of the Company's common stock, causing real economic loss to investors who purchased the Company's common stock during the Class Period.

174. The declines in the price of the Company's common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in the Company's common stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic, or industry factors, or by Company-specific facts unrelated to defendants' fraudulent conduct.

175. Defendants false statements on March 11, 2016 caused Rentech's stock price to close at $2.55 (up from a close of $2.42 on March 8, 2016) and to reach a near-term high of 3.82 on April 26, 2016.

176. Defendants' false statements on August 10, 2016 and August 15, 2016 sent Rentech shares soaring more than 20% in a day and over 50% in seven trading

days. Rentech's stock price to rose from a close of $2.57 per share on August 9, 2016, to a close of $3.76 on August 24, 2016.

177. On February 21, 2017, the price of Rentech common stock plunged $1.31 per share, or 47.6%, as compared to market close on February 17, 2017, on unusually high trading volume of more than 3 million shares trading – nearly ten times the average daily trading volume, on news that the Wawa plant would be idled and the Company was pursuing strategic alternatives. By February 28, 2017, the Company's common stock had plummeted more than 72% in six days.

178. On March 16, 2017, the price of Rentech common stock fell to $0.59 per share on unusually high trading volume, following the report that Rentech would delay filing its annual report.

179. On April 4, 2017 and April 6, 2017, Rentech reports its corrected financial results for the periods ending June 30, 2016 and September 30, 2016, and disclosed the full extent of the Company's material weakness over financial reporting. Rentech's stock price declined from a closing price on April 3, 2017 of $0.49 per share to $0.47, before finally closing at $0.39 on April 17, 2017.

180. In sum, during the Class Period, the Company's stock price declined from $2.63 per share on the first day of the Class Period to $0.47 per share on the last day of the Class Period, as the Company's true financial condition was revealed to the investing public.

181. The economic loss (damages) suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of the Company's common stock and the subsequent significant decline in the value of the Company's common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## CLASS ACTION ALLEGATIONS

182. Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all those who purchased the Company's common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have, or had, a controlling interest.

183. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's common stock was actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

184. Plaintiff's claims are typical of the claims of the members of the Class, since all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law alleged herein.

185. Plaintiff will fairly and adequately protect the interests of the members of the Class, and has retained counsel competent and experienced in class action and securities litigation.

186. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts constituted violations of the federal securities laws;

(b) whether Defendants' statements made to the investing public during the Class Period misrepresented material facts concerning the Company's business, operations, and financial condition;

(c) whether the price of the Company's common stock was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

187. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. Additionally, there will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

188. At all relevant times, the market for the Company's common stock was an efficient market for the following reasons, among others:

(a) The Company's common stock met the requirements for listing, and was listed and actively traded on, NASDAQ, a highly efficient, electronic stock market;

(b) The Company had more than 23.19 million shares outstanding as of November 9, 2016. During the Class Period, on average, 305,001 shares of Rentech stock were traded on a daily basis, demonstrating a very active and broad market for Rentech stock, and permitting a very strong presumption of an efficient market;

(c) As a regulated issuer, the Company filed periodic public reports with the SEC;

(d) The Company regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e) The Company was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

189. As a result of the foregoing, the market for the Company's common stock promptly digested current information concerning the Company from all publicly available sources and reflected such information in the prices of the Company's stock. Under these circumstances, all purchasers of the Company's common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

190. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements alleged herein. Many of the specific statements alleged herein were not identified as "forward-looking statements" when made, and thus are not entitled to protection under the safe harbor provision. Additionally, to the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent

that the statutory safe harbor does apply to any forward-looking statements alleged herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

**COUNT I**
**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Promulgated Thereunder Against All Defendants**

191. Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

192. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew, or were deliberately reckless in not knowing, were misleading. These statements were false and misleading because they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

193. Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact/and or omitted to state material facts necessary to make the statements made not misleading; and (3) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

194. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid – or at all – if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

195. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

196. Plaintiff repeats and realleges each and every allegation contained above as though set forth in full herein.

197. The Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and/or intimate knowledge of the Company's statements filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements alleged to be false and misleading herein.

198. The Individual Defendants, moreover, were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged to be false and misleading herein. The Individual Defendants were provided with, or had unlimited access to, such documents and statements prior to, and/or shortly after these statements were issued, and therefore had the ability to prevent the issuance of the statements and/or cause the statements to be corrected. Additionally, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and had the power to control or influence the particular transactions giving rise to the securities violations.

199. The Individual Defendants all had ultimate authority over the Company's statements, including controlling the content of such statements and whether and how to communicate such statements to the public.

200. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff, and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED: December 5, 2018

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Ex Kano S. Sams II*
LIONEL Z. GLANCY
ROBERT V. PRONGAY
EX KANO S. SAMS II
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: esams@glancylaw.com

**HOLZER & HOLZER, LLC**
COREY D. HOLZER
MARSHALL P. DEES
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029

*Lead Counsel for Lead Plaintiff*