UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | CV 17-1490-GW(FFMx) | Date | October 10, 2019 |
| Title | *Cheng Jiangchen v. Rentech, Inc., et al.* | | |

| | |
|---|---|
| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE |

| Javier Gonzalez | Terri A. Hourigan | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Ex Kano S. Sams II | Virginia Milstead |

**PROCEEDINGS:** **LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION [104]**

**LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES REIMBURSEMENT OF LITIGATION EXPENSES [106]**

Court and counsel confer. The Tentative circulated and attached hereto, is adopted as the Court's Final Ruling. The Court would grant ths Motions for Final Settlement Approval and Attorney's Fees.

: 03

Initials of Preparer JG

<u>*Jiangchen v. Rentech, Inc., et al.*</u>; Case No. 2:17-cv-01490-GW-(FFMx)
Tentative Ruling on Motion for Final Settlement Approval of Class Action Settlement and Plan of Allocation and Motion for Attorney's Fees and Litigation Expenses

I. **Background**

A. Introduction

Plaintiff Ichiro Ikuno ("Lead Plaintiff")[1], individually and on behalf of all others similarly situated, sues Keith Forman and Jeffrey Spain (collectively, "Defendants")[2] for: (1) violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5; and (2) violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). *See generally* Fourth Amended Complaint ("Operative Complaint"), Docket No. 82.

While a motion to dismiss the Operative Complaint was pending before this Court, the parties filed a notice of settlement. *See* Joint Stipulation for Settlement Regarding Notice of Settlement, Docket No. 89. The Court granted preliminary certification of the proposed class, approval of the proposed settlement, and approval of the form and method for class notice. *See* Order Preliminarily Approving Settlement and Providing for Notice, Docket No. 102. Lead Plaintiff now moves, unopposed, for the Court to issue a final approval of the class action settlement and plan of allocation. *See generally* Memorandum in Support of Motion for Final Approval of Class Action Settlement and Plan of Allocation ("Settlement Motion"), Docket No. 104. Lead Plaintiff also moves, unopposed, for attorney's fees and reimbursement of litigation expenses. *See generally* Memorandum in Support of Motion for Attorney Fees and Reimbursement of Litigation Expenses ("Fees Motion"), Docket No. 106.

B. Factual Background

The Court has previously laid out Lead Plaintiff's allegations against Defendants in the Court's various rulings on the motions to dismiss. *See, e.g.*, Minutes of Defendants' Motion to

---

[1] The Court appointed Ichiro Ikuno, a member of the proposed class, as Lead Plaintiff. *See* Docket No. 20. The Court further appointed Glancy Prongay & Murray LLP and Holzer & Holzer, LLC as Lead Counsel for the putative class. *Id.*

[2] Forman was the President and CEO of Rentech, Inc. ("Rentech") and Spain was the CFO. *See* Operative Complaint ¶¶ 25-26. Rentech is listed in the caption, but Plaintiff voluntarily dismissed Rentech from this action on July 24, 2018 because the company had filed for bankruptcy. *See* Notice of Dismissal, Docket No. 70.

Dismiss Third Amended Class Action Complaint ("Third Motion to Dismiss Ruling"), Docket No. 79 (made final at Docket No. 80). Therefore, the Court will provide only a brief overview of the allegations here for the benefit of the discussion.

Lead Plaintiff generally alleged as follows:

Rentech was a California corporation with three core businesses: (1) contract wood-handling and chipping services; (2) the manufacture and sale of wood pellets for the heating market in the United States; and (3) the manufacture, aggregation, and sale of wood pellets for the utility and industrial power generation market. Operative Complaint ¶ 29. Before August 2015, Rentech also engaged in the sale of fertilizer through its 59.7% ownership of Rentech Nitrogen Partners ("RNP"). *Id.* ¶ 30. On August 9, 2015, Rentech divested from RNP, meaning that wood fibre processing became its primary industry. *See id.* ¶ 31. Rentech's wood fibre processing consisted of wood chipping services to the pulp, paper and packaging industry, as well as the production of wood pellets. *Id.* ¶ 32.

Rentech separately produced industrial wood pellets that were used in larger scale power generation facilities. *Id.* ¶ 34. Before the start of the proposed class period, Rentech began converting two "brownfield areas" in Ontario, Canada into wood pellet facilities – one in Atikokan and the other in Wawa. *Id.* When fully operational, Defendants told investors that Rentech's facility in Atikokan was expected to produce up to 110,000 metric tons of wood pellets annually, while the facility in Wawa was expected to produce up to 450,000 metric tons annually. *Id.* But repairs to the facilities and other required modifications affected the facilities' ability to produce at the expected capacities, and hindered Rentech's ability to ship enough wood pellets to meet obligations to customers. *See id.* ¶¶ 35-38.

Rentech was a highly-leveraged company. *Id.* ¶ 2. Its inability to generate revenue with functioning plants – combined with the high cost of ongoing repairs at its Canadian wood-pellet facilities – threatened Rentech's ability to service its debts. *Id.* ¶ 3. Although Defendants were aware that Rentech experienced revenue, cash flow, and liquidity challenges so severe that they threatened Rentech's ability to continue to service its debts, Defendants nevertheless painted a rosy public picture to investors. *See id.* ¶¶ 8-11.

Defendants also had problems with Rentech's publicly-filed financial reports in the wake of its divestment from RNP. *See id.* ¶¶ 13-16. On August 10, 2016, Defendants issued a press release (the "August 10, 2016 Press Release"), which was filed with the SEC, stating that the

Company generated income from continuing operations of $79.8 million and income from discontinued operations of $232.2 million, net of tax, for the six months ending June 30, 2016, which included the closing date of the RNP divestiture. *Id.* ¶ 53. As Defendants would later admit, however, the reported results were materially overstated. Specifically, Rentech should have recorded a loss from continuing operations for the six months ended June 30, 2016 of $19.9 million instead of a profit, and should have recorded income from discontinued operations of $310.6 million for the same period. *Id.* ¶ 54. On April 4, 2017, Rentech filed a Form 8-K informing investors that the Company's previously-issued financial statements should not be relied upon. *Id.* ¶ 97.

Lead Plaintiff therefore sought recovery on behalf of investors who purchased shares during the time Defendants Forman and Spain made material misrepresentations and omissions from Rentech's public statements that undermined their claims of operational and financial improvements following the divestiture of RNP. *Id.* ¶ 18. The proposed class was (and is) all persons and entities that purchased or otherwise acquired Rentech common stock during the proposed class period of March 15, 2016 to April 6, 2017. *Id.* ¶ 1.

C. <u>Procedural History and the Proposed Settlement</u>

This Court has dismissed Lead Plaintiff's claims three times. As to Lead Plaintiff's First Amended Complaint, the Court held that the allegations constituted a "puzzle pleading" and would need to be stated more concisely. *See* Minutes of Defendants' Motion to Dismiss Class Action Complaint, Docket No. 40, at 10. On the second motion to dismiss, the Court concluded that Lead Plaintiff had sufficiently alleged that Defendants had made material misrepresentations, but that the complaint did not adequately plead scienter. *See* Minutes of Defendants' Motion to Dismiss Class Action Complaint, Docket No. 66, at 6-15. Lead Plaintiff added further allegations to a Third Amended Complaint, but the Court again found that it did not plead scienter. *See* Third Motion to Dismiss Ruling. Still, the Court gave the Lead Plaintiff one final opportunity to state its claims, and the Lead Plaintiff filed the Operative Complaint. Defendants again moved to dismiss, *see* Docket No. 84, Lead Plaintiff opposed, *see* Docket No. 86, and Defendants filed a Reply, *see* Docket No. 87.

Ten days before the hearing on the motion to dismiss, the parties filed their notice of settlement. Docket No. 89.

The Stipulation and Agreement of Settlement (the "Settlement") provides the following

3

details and provisions. *See generally* Settlement, Declaration of Ex Kano S. Sams II in Support of Motion ("Sams Decl."), Ex. 1, Docket No. 97-1. On February 28, 2019, the Parties participated in a mediation session before Robert A. Meyer, Esq., of JAMS *See id.* ¶ M; Motion at 2. The negotiations culminated in an agreement to settle and release all claims asserted against Defendants in the action in return for a cash payment of $2,050,000 by or on behalf of Defendants (the "Settlement Amount") for the benefit of the "Settlement Class." *See* Settlement ¶ M. The Settlement Class means all persons and entities who or which purchased or otherwise acquired Rentech common stock between March 15, 2016 and April 6, 2017, inclusive (the "Settlement Class Period") and were damaged thereby. *Id.* ¶ 1(qq). The Settlement Amount, plus accrued interest, and after deduction of (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court (which may include reimbursement to Lead Plaintiff for his costs and expenses incurred in representing the Settlement Class); and (iv) any attorney's fees awarded by the Court constitutes the "Net Settlement Fund." The Net Settlement Fund will be distributed among Settlement Class Members who submit valid Claim Forms ("Authorized Claimants"), in accordance with the proposed Plan of Allocation. *See* Motion at 3; Settlement ¶ 1(w).

The "Plan of Allocation" distributes the Net Settlement Fund among Settlement Class Members who submit valid Claim Forms on a *pro rata* basis based on the amount of each Claimant's "Recognized Claim." *See* Settlement ¶ 1(dd); ¶ 25; *see also* Proposed Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorney's Fees and Reimbursement of Litigation Expenses ("Proposed Notice"), Lead Counsel Decl., Ex. 1., at p. 67-68 of 105 of PDF. The formula for determining each Claimant's Recognized Claim is based on an out-of-pocket measure of damages consistent with the alleged violations of the Exchange Act. *Id.* at p. 68-70 of 105.

## II.     Legal Standards
### A.  Rule 23(e)

Under Rule 23(e) of the Federal Rules of Civil Procedure, "claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). The requirements of Rule 23(e) set forth the procedures for approval of class action settlements. First, the court must direct notice in a reasonable manner to all Class Members who would be bound by the settlement. Fed. R. Civ. P. 23(e)(1). Class

Members should be given the opportunity to opt-out of the settlement and to object to the settlement. Fed. R. Civ. P. 23(e)(4)-(5). A court may only approve a binding settlement after a hearing and on finding that the settlement is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2).

A court must engage in a two-step process to approve a proposed class action settlement. First, the court must determine whether the proposed settlement deserves preliminary approval. *Nat'l Rural Telecommc'ns Coop. v. DirecTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004). This step has already been completed here, as the Court preliminarily approved the settlement on March 14, 2019. *See* Order Preliminarily Approving Settlement and Providing for Notice, Docket No. 102. Second, after notice is given to Class Members, a court must determine whether final approval is warranted. *Nat'l Rural Telecommc'ns Coop.*, 221 F.R.D. at 525.

To grant final approval, the court must find that the proposed settlement is fair, adequate, and reasonable. *See Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (*citing Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)). In making this determination, the court may consider any or all of the following factors:

> (1) the strength of plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed, and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the Class Members to the proposed settlement.

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982); *Hanlon*, 150 F.3d at 1026. This list is not exhaustive, and "[t]he relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice*, 688 F.2d at 625. At least where settlement is reached prior to formal class certification, courts also look for signs of collusion or other conflicts of interest. *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011).

Under recent amendments to the Federal Rules of Civil Procedure, district courts must now consider a list of factors delineated in Rule 23(e)(2), which are somewhat similar to the Ninth Circuit's longstanding factors and considerations:

> **(2) *Approval of the Proposal.*** If the proposal would bind Class Members, the court

5

> may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
>> **(A)** the class representatives and class counsel have adequately represented the class;
>> **(B)** the proposal was negotiated at arm's length;
>> **(C)** the relief provided for the class is adequate, taking into account:
>>> **(i)** the costs, risks, and delay of trial and appeal;
>>> **(ii)** the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>>> **(iii)** the terms of any proposed award of attorney's fees, including timing of payment; and
>>> **(iv)** any agreement required to be identified under Rule 23(e)(3); and
>> **(D)** the proposal treats Class Members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

Regarding these recent amendments, the Advisory Committee recognizes that federal "[c]ourts have generated lists of factors" to decide the fairness, reasonableness, and adequacy of a settlement, and that "each circuit has developed its own vocabulary for expressing these concerns." Fed. R. Civ. P. 23(e)(2) Advisory Committee's Note to 2018 amendment. Recognizing that, the Advisory Committee explained that it did not intend to "displace any factor [used by federal courts], but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."[3] *Id.* As such, to the extent possible the Court would apply the factors listed in Rule 23(e)(2) through the lens of the Ninth Circuit's factors and existing relevant precedent. The Court would also take heed of the Advisory Committee's warning not to let "[t]he sheer number of factors . . . distract both the court and the parties from the central concerns that bear on review under Rule 23(e)(2)." Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2018 amendment.

Despite the importance of fairness, the court must also be mindful of the Ninth Circuit's policy favoring settlement, particularly in class actions. *See*, *e.g.*, *Officers for Justice*, 688 F.2d at 625 ("[V]oluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation"). While balancing all of these interests, the court's inquiry is ultimately limited "to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating

---

[3] "[T]he Advisory Committee Notes provide a reliable source of insight into the meaning of a rule . . . ." *See United States v. Vonn*, 535 U.S. 55, 64 n.6 (2002).

6

parties." *Id.* "It is the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Hanlon*, 150 F.3d at 1026. "Settlement is the offspring of compromise; the question . . . is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Id.* at 1027.

    B. Rule 23(h)

Rule 23(h) provides that, "[i]n a certified class action, the court may award reasonable attorney's fees . . . that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). Courts have discretion to choose among two different methods for calculating a reasonable attorney's fee award. *See In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935, 941 (9th Cir. 2011); *Laffitte v. Robert Half Int'l Inc.,* 1 Cal.5th 480, 504 (2016) ("The choice of a fee calculation method is generally one within the discretion of the trial court[.]").

Under the lodestar method, the court multiplies the number of reasonable hours expended by a reasonable hourly rate. *See Hanlon*, 150 F.3d at 1029. Once the lodestar has been determined, the "figure may be adjusted upward or downward to account for several factors including the quality of the representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Id*. The lodestar method is typically utilized when the relief obtained is "not easily monetized," such as when injunctive relief is part of the settlement. *See Bluetooth*, 654 F.3d at 941. The court's discretion in choosing between these two methods "must be exercised so as to achieve a reasonable result." *Id.* at 942; *see Laffitte*, 1 Cal.5th at 504 ("[T]he goal under either the percentage or lodestar approach [is to] award . . . a reasonable fee to compensate counsel for their efforts.").

"Under the percentage-of-the-fund or percentage-of-recovery method, the court simply awards the attorneys a percentage of the fund sufficient to provide class counsel with a reasonable fee." *Chambers v. Whirlpool Corp.*, 214 F.Supp.3d 877, 893 (C.D. Cal. 2016) (internal quotations and citations omitted). This method is typically used where attorney's fees will be paid out of a common fund. *See Bluetooth*, 654 F.3d at 942. Because the attorney's fees requested in this case will be paid from a common fund, the Court finds the percentage-of-the-fund method appropriate.

**III.   Discussion**
    A. Final Certification of the Class

On June 27, 2019, the Court preliminarily certified the class, finding that the class definition met the Rule 23(b)(3) requirements for class certification. Docket No. 103. Nothing in

the intervening period has suggested to the Court that the class should be decertified. Accordingly, the Court would continue to hold that class certification is appropriate for the purposes of settlement.

    B.  Final Class Settlement Approval

        1. *Adequacy of Representation*

The Court is satisfied that Plaintiffs' Counsel and the Named Plaintiffs have served as adequate representatives of the class. Lead Plaintiff and Counsel in this case did not display any conflicts of interest with other class members. The claims of Lead Plaintiff and the other Settlement Class Members arise from the same alleged conduct: the purchase of Rentech stock at inflated prices based on Defendants' alleged material misstatements. *See In re Polaroid ERISA Litig.*, 240 F.R.D. 65, 77 (S.D.N.Y. 2006) ("Where plaintiffs and class members share the common goal of maximizing recovery, there is no conflict of interest between the class representatives and other class members."). Lead Counsel has also adequately represented the class. Lead Counsel has significant experience in securities class action lawsuits, *see* Exhibit 4, Glancy Prongay & Murray LLP ("GPM") Firm Resume, Docket No. 108-4; Exhibit 5, Holzer & Holzer, LLC ("Holzer) Firm Resume, Docket No. 108-5, and Lead Counsel vigorously pursued Plaintiff's claims, including through four rounds of motions to dismiss and amended complaints. The Court has no reason to believe that Plaintiffs' Counsel did not adequately represent the class.

        2. *Arm's Length Negotiation*

Here, after Lead Plaintiff had filed five complaints and Defendants had filed four motions to dismiss, the parties attended a private mediation with a JAMS mediator. *See* Settlement ¶ M. The mediation was purportedly "an all-day, in-person" session that included "hard-fought negotiations." *See id.* Based on the vigorousness with which the parties litigated this case, and the seemingly comprehensive and professional nature of the private mediation, the Court is inclined to find that the Settlement is the product of serious, informed, non-collusive negotiations performed at arms-length. *See Rodriguez v. West Publish. Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) ("We put a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution, and have never prescribed a particular formula by which that outcome must be tested.") (citations omitted); *In re Zynga Inc. Secs. Litig.*, 2015 WL 6471171, at *9 (N.D. Cal. Oct. 27, 2015) (holding that the parties' use of mediator and the fact that significant discovery had been conducted "support the conclusion that the Plaintiff was appropriately informed in negotiating a

8

settlement"); *Harris v. Vector Mktg. Corp.*, No. C-08-5198 EMC, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011) (noting that the parties' use of a mediator "suggests that the parties reached the settlement in a procedurally sound manner and that it was not the result of collusion or bad faith by the parties or counsel.").

Next, although the Court does not grant undue weight to the recommendation of the parties' counsel, the fact they are experienced litigators in this field, have worked on this case at length, and have an understanding of its risks, also cuts in favor of finding the settlement procedurally robust and the product of arm's length negotiations. *See In re Heritage Bond Litig.*, 2005 WL 1594403, at *9 (C.D. Cal. June 10, 2005) ("The recommendation of experienced counsel carries significant weight in the court's determination of the reasonableness of the settlement.") (quotation omitted).

Lastly, none of the "subtle signs of collusion" that the Ninth Circuit has warned of are present here. *See e.g. In re Bluetooth*, 654 F.3d at 947. Settlement Class Members will be receiving monetary distribution commensurate with their *pro rata* share of the Settlement Fund. Further, Lead Counsel will be applying for a percentage of the common fund fee award in an amount not to exceed 33 1/3% of the Settlement Fund to compensate them for the services they have rendered on behalf of the Settlement Class. *See generally* Fees Motion. The award of attorneys' fees is separate from the approval of the Settlement, and neither Lead Plaintiff nor Lead Counsel may cancel or terminate the Settlement based on this Court's or any appellate court's ruling with respect to attorneys' fees. *See* Settlement ¶ 18. Moreover, there is no indication of a "clear sailing" arrangement or an arrangement for unawarded fees to revert to Defendants rather than the class members. *See* Settlement ¶ 1(w) (defining Net Settlement Fund to include attorneys' fees); ¶ 16 ("The Settlement is not a claims-made settlement. Upon the occurrence of the Effective Date, no Defendant, Defendants' Releasee, or any other person or entity who or which paid any portion of the Settlement Amount shall have any right to the return of the Settlement Fund or any portion thereof for any reason whatsoever, including without limitation, the number of Claim Forms submitted, the collective amount of Recognized Claims of Authorized Claimants, the percentage of recovery of losses, or the amounts to be paid to Authorized Claimants from the Net Settlement Fund.").

As such, the Court would conclude that this factor weighs in favor of final approval.

    3. *Costs and Risks of Further Litigation*

Next, the Court must "balance the continuing risks of litigation (including the strengths and weaknesses of the Plaintiffs' case), with the benefits afforded to members of the Class, and the immediacy and certainty of a substantial recovery." *Velazquez v. Int'l Marine & Indus. Applicators, LLC*, No. 16CV494-MMA (NLS), 2018 WL 828199, at *4 (S.D. Cal. Feb. 9, 2018). In general, securities fraud class actions are complex cases that are time-consuming and difficult to prove. *See, e.g.*, *In re LJ Int'l Inc. Sec. Litig.*, 2009 WL 10669955, at *3 (commenting on the complexity of a securities fraud action); *In re Vivendi Universal, S.A., Sec. Litig.*, 2012 WL 362028, at *1 (S.D.N.Y. Feb. 6, 2012) (noting that, two years after jury verdict in plaintiffs' favor and ten years after the case was filed, shareholders had still received no recovery). In this case, continued litigation involved substantial risk for Plaintiffs. This Court has already granted three motions to dismiss, and a fourth is pending. Plaintiffs were particularly struggling to establish the required element of scienter on the part of Defendants, and Defendants continued to argue in their Fourth Motion to Dismiss that Plaintiffs had failed to establish scienter. *See* Motion to Dismiss Fourth Amended Complaint, Docket No. 84, p. 10-16. Defendants also argued that the Fourth Amended Complaint did not adequately allege loss causation. *See id.* p. 23-25. Moreover, Plaintiffs may have faced obstacles to obtaining compensation even in the event of a judgment in their favor, as Rentech filed for bankruptcy during the case. *See* Fourth Amended Complaint, ¶ 24. Given the complexity of the litigation, the significant legal issues facing the Class, and the uncertainty of Rentech's future, continued litigation presented a high risk for Plaintiffs.

The Court must weigh the risk to Plaintiffs against the value of the Settlement. The Settlement provides for a $2,050,000 Settlement Fund plus any accrued interest and minus: (i) any Taxes; (ii) any Notice and Administration Costs; (iii) any Litigation Expenses awarded by the Court; and (iv) any attorneys' fees awarded by the Court. *See* Settlement ¶1(w). Lead Counsel request attorney's fees of 33 1/3 % of the Settlement Fund, or $683,333.33 plus interest (discussed *infra*). *See* Fees Motion. Lead Counsel also seek reimbursement of $64,799.46 in litigation expenses and $3,500 in costs incurred by Lead Plaintiff. *See id.* Lead Plaintiff's damages expert estimated Lead Plaintiff's best case scenario for the total maximum damages as $20 million. *See* Declaration of Lead Counsel ("Lead Counsel Decl."), Docket No. 108, ¶¶ 6; 64. The estimate assumes that Lead Plaintiff would fully prevail on each of his claims at both summary judgment and after a jury trial, that the Court would certify the same class period as the Settlement Class Period, that the Court and jury would accept Lead Plaintiff's damages theory. *See id*. Thus, the

$2.05 million Settlement Amount represents approximately 10% of the total maximum damages potentially available.  *See id; see also* Stefan Boettrich and Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review (NERA Jan. 29, 2019) at p. 36, Fig. 28, Lead Counsel Decl., Ex. 4 (noting that median recovery in securities class actions in 2018 was approximately 2.6% of estimated damages*); In re LJ Int'l Inc. Sec. Litig.*, 2009 WL 10669955, at *4 (C.D. Cal. Oct. 19, 2009) (approving securities fraud class action settlement where recovery was 4.5% of maximum damages); *IBEW v. Int'l Game Tech., Inc.*, 2012 WL 5199742, at *3 (D. Nev. Oct. 19, 2012) (approving securities fraud class action settlement where recovery was 3.5% of maximum damages and noting "this amount is within the median recovery in securities class actions settled in the last few years").

The Court would therefore find that the Settlement Amount provides a reasonable benefit to Plaintiffs in light of the risks of continued litigation.  This factor cuts in favor of final approval.

### 4. *Equal Treatment of Class Members*

Considering the Settlement Agreement, the Court sees no significant indication of preferential treatment.  As described in the Proposed Notice:

> The Net Settlement Fund will be distributed to Authorized Claimants on a *pro rata* basis based on the relative size of their Recognized Claims. Specifically, a "Distribution Amount" will be calculated for each Authorized Claimant, which shall be the Authorized Claimant's Recognized Claim divided by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. If any Authorized Claimant's Distribution Amount calculates to less than $10.00, it will not be included in the calculation and no distribution will be made to such Authorized Claimant.

Proposed Notice at p. 71 of 105.

### 5. *Reaction of Class Members*

There have been no objections by class members to the Settlement or the Plan of Allocation.  *See* Reply in Support of Final Approval ("Reply"), Docket No. 110, p. 4.  "[T]he absence of any objections to the Settlement Agreement among Class Members supports final approval."  *In re Aftermarket Auto. Lighting Prod. Antitrust Litig.*, No. 09 MDL 2007-GW(PJWX), 2014 WL 12591624, at *3 (C.D. Cal. Jan. 10, 2014); *see also In re Toyota Motor Corp. Unintended Acceleration Mktg, Sales Practices & Prods. Liability Litig.*, 10-ML-2151-JVS, 2013 U.S. Dist. LEXIS 123298, at *263-64 (CD. Cal. July 24, 2013) ("The absence of a large number of objections

11

to a proposed class settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members."); *Atlas v. Accredited Home Lenders Holding Co.*, No. 07-CV-00488-H (CAB), 2009 WL 3698393, at *4 (S.D. Cal. Nov. 4, 2009) (recognizing that only two class members submitted objections to the plan of allocation in deciding to approve the plan of allocation). This Court similarly finds that the lack of objections from class members weighs in favor of granting final approval.

      6. *Other 23(e) Factors*

Other 23(e) factors also support final approval. The method proposed by the parties for processing Settlement Class Members' claims is typical for a securities fraud settlement. *See, e.g.*, *In re Wireless Facilities, Inc. Secs. Litig.*, 253 F.R.D. 630-45 (S.D. Cal. 2008) (describing claim submission and processing procedure); *New York State Teachers' Ret. Sys. v. Gen. Motors Co.*, 315 F.R.D. 226, 233-34 (E.D. Mich. 2016). As discussed below, the Court finds the proposed attorney's fees of 33 1/3 % of the Settlement Fund to be reasonable in light of the risk involved in this litigation, the work performed by Lead Counsel, and the fact that there were no objections to this amount. Moreover, approval of the requested attorney's fees is separate from approval of the Settlement, and the Settlement may not be terminated based on a ruling regarding attorney's fees. *See* Settlement ¶ 18. Finally, the parties note that they have entered into a confidential agreement, which establishes certain conditions under which Rentech may terminate the Settlement if Settlement Class Members, who collectively purchased a specific number of shares of Rentech common stock, request exclusion (or "opt out") from the Settlement. *See* Settlement Motion at 17. This type of agreement is common in securities fraud actions and does not weigh against preliminary approval. *See, e.g.*, *In re Carrier IQ, Inc., Consumer Privacy Litig.*, 2016 WL 4474366, at *5 (N.D. Cal. Aug. 25, 2016) (observing that the court was not troubled by the opt out deal between the parties).

    C. <u>Adequacy of Class Notice</u>

For a class judgment to bind an absent class member, Rule 23(e) requires that the absent Class Members receive adequate notice. *See Hanlon*, 150 F.3d at 1025; *Moralez v. Whole Foods Mkt., Inc.*, 897 F. Supp. 2d 987, 997 (N.D. Cal. 2012). As such, the rule requires that "[i]ndividual notice must be sent to all class members whose names and addresses may be ascertained through reasonable effort." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974). In addition, due process mandates that the "notice must be 'reasonably calculated, under all the circumstances, to

apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *See id.* at 174 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). Class notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

Similarly, the Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes notice requirements. *See* 15 U.S.C. § 78u-4(a)(7). Under the PSLRA, any proposed final settlement agreement "shall include each of the following statements, along with a cover page summarizing the information contained in such statements:" a statement of plaintiff recovery, a statement of potential outcomes of the case, a statement on attorneys' fees or costs, identification of lawyers' representatives, reasons for the settlement, other information as required by the court. *Id.*

Here, the Lead Counsel mailed, via first-class mail, 15,632 individual copies of the Postcard Notice to all Settlement Class Members who could be identified with reasonable effort, as well as brokerage firms and other nominees who regularly act as nominees for beneficial purchasers of stock. *See* Declaration of Adam Walter ("Walter Decl."), Docket No. 108-2, ¶¶ 2-7. The Postcard Notice directed potential Settlement Class Members to downloadable versions of the Notice and Claim Form posted online at www.RentechSecuritiesLitigation.com. *Id.* ¶ 68. Additionally, the Summary Notice was published in Investor's Business Daily and transmitted over the PR Newswire on August 12, 2019. *Id.* ¶ 8.

Lead Plaintiff submits that the combination of the mailed Postcard, published Summary Notice, and availability online of the Notice provides "the best notice that is practicable under the circumstances." Settlement Motion at 24. Other courts have approved similar notice plans in class action settlements. *See e.g. Shaffer v. Litton Loan Servicing, LP*, 2012 WL 10274679, at *8 (C.D. Cal. Nov. 13, 2012) (explaining how a postcard provided initial notice and directed class members to a website created by the claims administrator). The Court is inclined to agree that the plan to provide notice to potential Settlement Class Members satisfies Rule 23 (c)(2)(B).

The Court would also conclude the content of the Notice satisfied the Rule 23(c)(2)(B) and PSLRA requirements. The detailed Notice provided all of the required information, set forth in plain, easily understandable language, while the Postcard Notice and Summary Notice listed most of the required information. As such, the Court would approve the Notice provided.

D. Plan of Allocation

The "Plan of Allocation" distributes the Net Settlement Fund among Settlement Class Members who submit valid Claim Forms on a *pro rata* basis based on the amount of each Claimant's "Recognized Claim." *See* Settlement ¶ 1(dd); ¶ 25; *see also* Proposed Notice of (I) Pendency of Class Action and Proposed Settlement; (II) Settlement Fairness Hearing; and (III) Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Proposed Notice"), Lead Counsel Decl., Ex. 1., at p. 67-68 of 105 of PDF. The formula for determining each Claimant's Recognized Claim is based on an out-of-pocket measure of damages consistent with the alleged violations of the Exchange Act. *Id.* at p. 68-70 of 105. Each Class Member's allocation will therefore be proportionate to actual injury. The Court finds that the Plan of Allocation is "fair, reasonable, and adequate," *In re Omnivision Techs.*, 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2007), and the Court is inclined to approve the Plan of Allocation.

E. <u>Attorney's Fees</u>

Lead Counsel seek an attorney's fees award of 33 1/3 % of the Settlement Fund. *See generally* Fees Motion, Docket No. 107 at 10 of 33. This amounts to $683,333.33. *See id.* Lead Counsel also seek reimbursement of $64,799.46 in litigation expenses and $3,500 in costs incurred by Lead Plaintiff. *See id.*

"This circuit has established 25% of the common fund as a benchmark award for attorney fees." *Hanlon*, 150 F.3d at 1029. The actual percentage varies depending on the facts of each case, but in "most common fund cases, the award exceeds that benchmark." *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 491 (E.D. Cal. 2010) (internal quotation marks omitted). When determining the benchmark percentage to be applied in a given case, courts consider: (1) the results achieved for the class; (2) the risk of litigation; (3) the skill required and quality of work; (4) the contingent nature of the fee; and (5) awards made in similar cases. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002).

1. *Results Achieved*

"The result achieved is a significant factor to be considered in making a fee award." *In re Heritage Bond Litig.*, No. 02-ML-1475 DT, 2005 WL 1594403, at *19 (C.D. Cal. June 10, 2005). In this case, Lead Counsel achieved favorable results for the Class. As explained above, the maximum estimated damages for the Settlement Class were $20 million. *See* Lead Counsel Decl., ¶¶ 6; 64. The estimate assumes that Lead Plaintiff would fully prevail on each of his claims at both summary judgment and after a jury trial, that the Court would certify the same class period

14

as the Settlement Class Period, that the Court and jury would accept Lead Plaintiff's damages theory. *See id*. Thus, the $2.05 million Settlement Amount represents approximately 10% of the total maximum damages potentially available. *See id.* A 10% recovery of estimated damages is a favorable outcome in light of the challenging nature of securities class action cases. *See* Stefan Boettrich and Svetlana Starykh, Recent Trends in Securities Class Action Litigation: 2018 Full-Year Review (NERA Jan. 29, 2019) at p. 36, Fig. 28, Lead Counsel Decl., Ex. 4 (noting that median recovery in securities class actions in 2018 was approximately 2.6% of estimated damages*); In re LJ Int'l Inc. Sec. Litig.*, 2009 WL 10669955, at *4 (C.D. Cal. Oct. 19, 2009) (approving securities fraud class action settlement where recovery was 4.5% of maximum damages); *IBEW v. Int'l Game Tech., Inc.*, 2012 WL 5199742, at *3 (D. Nev. Oct. 19, 2012) (approving securities fraud class action settlement where recovery was 3.5% of maximum damages and noting "this amount is within the median recovery in securities class actions settled in the last few years"). Therefore, the results achieved in this case support the fee request.

        2.  *Risk of Litigation*

"The risk that further litigation might result in Plaintiffs not recovering at all, particularly a case involving complicated legal issues, is a significant factor in the award of fees." *Omnivision*, 559 F. Supp. 2d at 1046-47. Again, as discussed above, the risk of litigation in this case was significant. This Court has already granted three motions to dismiss, and a fourth is pending. Plaintiffs were particularly struggling to establish the required element of scienter on the part of Defendants, and Defendants continued to argue in their Fourth Motion to Dismiss that Plaintiffs had failed to establish scienter. *See* Motion to Dismiss Fourth Amended Complaint, Docket No. 84, p. 10-16. Defendants also argued that the Fourth Amended Complaint did not adequately allege loss causation. *See id.* p. 23-25. Moreover, Plaintiffs may have faced obstacles to obtaining compensation even in the event of a judgment in their favor, as Rentech filed for bankruptcy during the case. *See* Fourth Amended Complaint, ¶ 24. Given the complexity of the litigation, the significant legal issues facing the Class, and the uncertainty of Rentech's future, continued litigation presented a high risk for Plaintiffs. Thus, this factor also supports Lead Counsel's fee request.

        3.  *Skill Required and Quality of Work*

"The prosecution and management of a complex national class action requires unique legal skills and abilities. This is particularly true in securities cases because the Private Securities

Litigation Reform Act makes it much more difficult for securities plaintiffs to get past a motion to dismiss." *Omnivision*, 559 F. Supp. 2d at 1047 (internal citations and quotations omitted). Here, Lead Counsel came from firms with significant experience in securities litigation. *See* Lead Counsel Decl. ¶ 87; Ex. 4-C (GPM firm resume); Ex. 5-3 (Holzer firm resume). Lead Counsel shepherded the case through three motions to dismiss and successful settlement negotiations, despite facing significant challenges. *See discussion of risks, supra*. Finally, Lead Counsel faced a vigorous defense from Skadden, Arps, Slate, Maegher & Flom LLP, a respected national law firm. *See* Lead Counsel Decl. ¶ 88. This factor also supports granting the requested fee.

### 4. *Contingent Nature of the Fee*

"The importance of assuring adequate representation for plaintiffs who could not otherwise afford competent attorneys justifies providing those attorneys who do accept matters on a contingent-fee basis a larger fee than if they were billing by the hour or on a flat fee." *Omnivision*, 559 F. Supp. 2d at 1047. In this case, Lead Counsel have invested 1,898,89 hours of work with no compensation. *See* Lead Counsel Decl. ¶ 85. Moreover, Lead Counsel have done so while facing the real possibility of no recovery. This factor also supports the requested fees.

### 5. *Awards in Similar Cases*

While the Ninth Circuit in *Hanlon* set 25% as the benchmark award for attorney's fees, "in most common fund cases, the award exceeds that benchmark." *Omnivision*, 559 F. Supp. 2d at 1047-48; *see also In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1377 (N.D. Cal. 1989) (collecting cases and finding that "nearly all common fund awards range around 30%"). Plaintiffs have cited research finding that the median award of attorneys' fees in class action securities cases with settlements below $5 million was 33% between 2014 and 2018. *See* Lead Counsel Decl. Ex. 3, p. 41, figure 32. "Cases of under $10 Million will often result in result in fees above 25%." *Craft v. Cty. of San Bernardino*, 624 F. Supp. 2d 1113, 1127 (C.D. Cal. 2008). Given the similarity of the requested fees to those granted in similar cases, the Court finds that this factor also weighs in favor of granting the requested fees.

### 6. *Lack of Opposition*

Lead Counsel point out that there have been no objections filed to the requested attorney's fees. *See* Reply, p.5-6. This also supports granting the requested fees. *See, e.g.*, *Destefano v. Zynga, Inc.*, No. 12-CV-04007-JSC, 2016 WL 537946, at *18 (N.D. Cal. Feb. 11, 2016).

### 7. *Lodestar Cross-Check*

16

The Ninth Circuit has encouraged district courts to cross-check attorney's fees calculations against a second method. *See Bluetooth*, 654 F.3d at 944. Under the lodestar method, courts "calculate[] the fee award by multiplying the number of hours reasonably spent by a reasonable hourly rate and then enhancing that figure, if necessary, to account for the risks associated with the representation." *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989). Here, the Court would find that the lodestar method also supports Lead Counsel's request for attorney's fees. Counsel from GPM and Holzer worked a total of 1,898.89 hours on this case. *See* Lead Counsel Decl. ¶ 85. The current hourly rates for Lead Counsel range from $675 to $935 for partners and of counsel attorneys and $375 to $525 for associates.[4] *See id.* Exs. 4-A, 5-1. Thus, the total lodestar for this case is $1,330,208.10. *See id.* ¶ 85. The requested fee of 33 1/3% (plus interest) of the Settlement Fund represents a fractional multiplier of 0.514 to Lead Counsel's lodestar. *See id.*

"[C]ourts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases." *In re : Wash. Pub. Power Supply Sys. Sec. Litig.* ("*WPSS*"), 19 F.3d 1291, 1300 (9th Cir. 1994). In *WPSS*, for example, the Ninth Circuit found it an abuse of discretion for a district court not to apply a multiplier when the case was "fraught with risk and recovery was far from certain." *Id.* at 1302. Similarly, in *Vizcaino*, the Ninth Circuit approved a district court's application of a multiplier of 3.65. *Vizcaino*, 290 F.3d at 1051. Courts have found that a "multiplier of less than one . . . suggests that the negotiated fee award is a reasonable and fair valuation of the services rendered to the class by class counsel." *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 854 (N.D. Cal. 2010). This Court agrees, and this Court finds that the lodestar cross-check supports the reasonableness of Lead Counsel's requested attorney's fees.

F. Lead Counsel's Expenses

Next, Lead Counsel request reimbursement of expenses totaling $64,799.46. *See* Fees Motion, p. 20. "Attorneys may recover their reasonable expenses that would typically be billed to paying clients in non-contingency matters." *Omnivision*, 559 F. Supp. 2d at 1048. Here, Lead Counsel have included a detailed breakdown of their expenses, which included $20,788.00 for a private investigator who discovered and contacted former Rentech employees, $13,552.50 for retention of an expert in the field of loss causation and damages, and $7,640.03 for the combined

---

[4] These rates are similar to those billed by comparable firms, and the Court finds them reasonable. *See* Lead Counsel Decl. Ex. 13.

costs of online legal and factual research, as well as smaller expenses such as court filing fees, mediation fees, and the purchase of a shareholder list.  *See* Lead Counsel Decl. ¶ 98-106.  Lead Counsel aver that they "[took] steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case."  Lead Counsel Decl. ¶ 101.  Further, the requested amount is significantly below the maximum amount of $75,000 provided for in the Settlement Notice.  *See* Sams Decl., Ex. 1, Page 55 of 105.  The Court would therefore find it appropriate to reimburse Lead Plaintiffs for their reasonable costs and expenses.

      G.  <u>Lead Plaintiff's Expenses</u>

Finally, Lead Plaintiff requests reimbursements of $3,500 in costs and expenses.  *See* Fees Motion, p. 21.  The PSLRA permits Lead Plaintiffs to recover reasonable costs and expenses (including lost wages) incurred as a result of representing the class.  *See* 15 U.S.C. § 78u-4(a)(4).  Lead Plaintiff asserts that he dedicated at least 20 hours to this litigation, and he requests a reimbursement rate of $175 per hour.  *See* Lead Counsel Decl., Ex. 1, p. 4.  Lead Plaintiff assisted with this litigation by communicating with Lead Counsel regarding the case and litigation strategy, reviewing the pleadings and briefs filed, reviewing court orders, discussing mediation strategy with Lead Counsel, and evaluating the Settlement.  *See id.* ¶¶ 4-5.  The Court finds it reasonable and appropriate to reimburse Lead Plaintiff for his reasonable costs and expenses.

**IV.**  **Conclusion**

Based on the foregoing discussion, the Court would grant the Motions for Final Settlement Approval and Attorney's Fees.